(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WILLIAMS-YULEE *v.* FLORIDA BAR

### CERTIORARI TO THE SUPREME COURT OF FLORIDA

No. 13–1499.  Argued January 20, 2015—Decided April 29, 2015

Florida is one of 39 States where voters elect judges at the polls.  To promote public confidence in the integrity of the judiciary, the Florida Supreme Court adopted Canon 7C(1) of its Code of Judicial Conduct, which provides that judicial candidates "shall not personally solicit campaign funds . . . but may establish committees of responsible persons" to raise money for election campaigns.

Petitioner Lanell Williams-Yulee (Yulee) mailed and posted online a letter soliciting financial contributions to her campaign for judicial office.  The Florida Bar disciplined her for violating a Florida Bar Rule requiring candidates to comply with Canon 7C(1), but Yulee contended that the First Amendment protects a judicial candidate's right to personally solicit campaign funds in an election.  The Florida Supreme Court upheld the disciplinary sanctions, concluding that Canon 7C(1) is narrowly tailored to serve the State's compelling interest.

*Held*: The judgment is affirmed.

138 So. 3d 379, affirmed.

CHIEF JUSTICE ROBERTS delivered the opinion of the Court, except as to Part II, concluding that the First Amendment permits Canon 7C(1)'s ban on the personal solicitation of campaign funds by judicial candidates.  Pp. 8–22.

(a)  Florida's interest in preserving public confidence in the integrity of its judiciary is compelling.  The State may conclude that judges, charged with exercising strict neutrality and independence, cannot supplicate campaign donors without diminishing public confidence in judicial integrity.  Simply put, the public may lack confidence in a judge's ability to administer justice without fear or favor if he comes to office by asking for favors.  This Court's precedents have recognized the "vital state interest" in safeguarding "'public confidence in

the fairness and integrity of the nation's elected judges,'" *Caperton* v. *A. T. Massey Coal Co.*, 556 U. S. 868, 889. Unlike the legislature or the executive, the judiciary "has no influence over either the sword or the purse," Federalist No. 78, p. 465 (A. Hamilton), so its authority depends in large measure on the public's willingness to respect and follow its decisions. Public perception of judicial integrity is accordingly "'a state interest of the highest order.'" 556 U. S., at 889.

A State's interest in preserving public confidence in the integrity of its judiciary extends beyond its interest in preventing the appearance of corruption in legislative and executive elections, because a judge's role differs from that of a politician. *Republican Party of Minn.* v. *White*, 536 U. S. 765, 783. Unlike a politician, who is expected to be appropriately responsive to the preferences of supporters, a judge in deciding cases may not follow the preferences of his supporters or provide any special consideration to his campaign donors. As in *White*, therefore, precedents applying the First Amendment to political elections have little bearing on the issues here.

The vast majority of elected judges in States allowing personal solicitation serve with fairness and honor, but in the eyes of the public, a judicial candidate's personal solicitation could result (even unknowingly) in "a possible temptation . . . which might lead him not to hold the balance nice, clear and true." *Tumey* v. *Ohio*, 273 U. S. 510, 532. That risk is especially pronounced where most donors are lawyers and litigants who may appear before the judge they are supporting. In short, it is the regrettable but unavoidable appearance that judges who personally ask for money may diminish their integrity that prompted the Supreme Court of Florida and most other States to sever the direct link between judicial candidates and campaign contributors. Pp. 9–12.

(b) Canon 7C(1) raises no fatal underinclusivity concerns. The solicitation ban aims squarely at the conduct most likely to undermine public confidence in the integrity of the judiciary: personal requests for money by judges and judicial candidates. The Canon applies evenhandedly to all judges and judicial candidates, regardless of viewpoint or means of solicitation. And unlike some laws that have been found impermissibly underinclusive, Canon 7C(1) is not riddled with exceptions.

Yulee relies heavily on the provision of Canon 7C(1) that allows solicitation by a candidate's campaign committee. But Florida, along with most other States, has reasonably concluded that solicitation by the candidate personally creates a categorically different and more severe risk of undermining public confidence than does solicitation by a campaign committee. When the judicial candidate himself asks for money, the stakes are higher for all involved. A judicial candidate

asking for money places his name and reputation behind the request, and the solicited individual knows that the same person who signed the fundraising letter might one day sign the judgment. This dynamic inevitably creates pressure for the recipient to comply, in a way that solicitation by a third party does not. Just as inevitably, the personal involvement of the candidate in the solicitation creates the public appearance that the candidate will remember who says yes, and who says no. However similar the two solicitations may be in substance, a State may conclude that they present markedly different appearances to the public.

Permitting a judicial candidate to write thank you notes to campaign donors likewise does not detract from the State's interest in preserving public confidence in the integrity of the judiciary. The State's compelling interest is implicated most directly by the candidate's personal solicitation itself. A failure to ban thank you notes for contributions not solicited by the candidate does not undercut the Bar's rationale.

In addition, the State has a good reason for allowing candidates to write thank you notes and raise money through committees. These accommodations reflect Florida's effort to respect the First Amendment interests of candidates and their contributors—to resolve the "fundamental tension between the ideal character of the judicial office and the real world of electoral politics." *Chisom* v. *Roemer*, 501 U. S. 380, 400. The State should not be punished for leaving open more, rather than fewer, avenues of expression, especially when there is no indication of a pretextual motive for the selective restriction of speech. Pp. 12–16.

(c) Canon 7C(1) is also not overinclusive. By any measure, it restricts a narrow slice of speech. It leaves judicial candidates free to discuss any issue with any person at any time; to write letters, give speeches, and put up billboards; to contact potential supporters in person, on the phone, or online; and to promote their campaigns through the media. Though they cannot ask for money, they can direct their campaign committees to do so.

Yulee concedes that Canon 7C(1) is valid in numerous applications, but she contends that the Canon cannot constitutionally be applied to her chosen form of solicitation: a letter posted online and distributed via mass mailing. This argument misperceives the breadth of the compelling interest underlying Canon 7C(1). Florida has reasonably determined that personal appeals for money by a judicial candidate inherently create an appearance of impropriety that may cause the public to lose confidence in the integrity of the judiciary. That interest may be implicated to varying degrees in particular contexts, but the interest remains whenever the public perceives the judge person-

ally asking for money. Canon 7C(1) must be narrowly tailored, not "perfectly tailored." *Burson* v. *Freeman*, 504 U. S. 191, 209. The First Amendment does not confine a State to addressing evils in their most acute form. Here, Florida has concluded that all personal solicitations by judicial candidates create a public appearance that undermines confidence in the integrity of the judiciary; banning all personal solicitations by judicial candidates is narrowly tailored to address that concern.

Yulee errs in contending that Florida can accomplish its compelling interest through recusal rules and campaign contribution limits. A rule requiring recusal in every case in which a lawyer or litigant made a campaign contribution would disable many jurisdictions, and a flood of postelection recusal motions could exacerbate the very appearance problem the State is trying to solve. As for contribution limits, Florida already applies them to judicial elections, and this Court has never held that adopting such limits precludes a State from pursuing its compelling interests through additional means.

The desirability of judicial elections is a question that has sparked disagreement for more than 200 years, but it is not the Court's place to resolve that enduring debate. The Court's limited task is to apply the Constitution to the question presented in this case. Judicial candidates have a First Amendment right to speak in support of their campaigns. States have a compelling interest in preserving public confidence in their judiciaries. When the State adopts a narrowly tailored restriction like the one at issue here, those principles do not conflict. A State's decision to elect judges does not compel it to compromise public confidence in their integrity. Pp. 16–22.

ROBERTS, C. J., delivered the opinion of the Court, except as to Part II. BREYER, SOTOMAYOR, and KAGAN, JJ., joined that opinion in full, and GINSBURG, J., joined except as to Part II. BREYER, J., filed a concurring opinion. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment, in which BREYER, J., joined as to Part II. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined. KENNEDY, J., and ALITO, J., filed dissenting opinions.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–1499

LANELL WILLIAMS-YULEE, PETITIONER *v.*
THE FLORIDA BAR

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
FLORIDA

[April 29, 2015]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court, except as to Part II.

Our Founders vested authority to appoint federal judges in the President, with the advice and consent of the Senate, and entrusted those judges to hold their offices during good behavior. The Constitution permits States to make a different choice, and most of them have done so. In 39 States, voters elect trial or appellate judges at the polls. In an effort to preserve public confidence in the integrity of their judiciaries, many of those States prohibit judges and judicial candidates from personally soliciting funds for their campaigns. We must decide whether the First Amendment permits such restrictions on speech.

We hold that it does. Judges are not politicians, even when they come to the bench by way of the ballot. And a State's decision to elect its judiciary does not compel it to treat judicial candidates like campaigners for political office. A State may assure its people that judges will apply the law without fear or favor—and without having personally asked anyone for money. We affirm the judgment of the Florida Supreme Court.

I

A

When Florida entered the Union in 1845, its Constitution provided for trial and appellate judges to be elected by the General Assembly. Florida soon followed more than a dozen of its sister States in transferring authority to elect judges to the voting public. See J. Shugerman, The People's Courts: Pursuing Judicial Independence in America 103–122 (2012). The experiment did not last long in the Sunshine State. The war came, and Florida's 1868 Constitution returned judicial selection to the political branches. Over time, however, the people reclaimed the power to elect the state bench: Supreme Court justices in 1885 and trial court judges in 1942. See Little, An Overview of the Historical Development of the Judicial Article of the Florida Constitution, 19 Stetson L. Rev. 1, 40 (1989).

In the early 1970s, four Florida Supreme Court justices resigned from office following corruption scandals. Florida voters responded by amending their Constitution again. Under the system now in place, appellate judges are appointed by the Governor from a list of candidates proposed by a nominating committee—a process known as "merit selection." Then, every six years, voters decide whether to retain incumbent appellate judges for another term. Trial judges are still elected by popular vote, unless the local jurisdiction opts instead for merit selection. Fla. Const., Art. V, §10; Hawkins, Perspective on Judicial Merit Retention in Florida, 64 Fla. L. Rev. 1421, 1423–1428 (2012).

Amid the corruption scandals of the 1970s, the Florida Supreme Court adopted a new Code of Judicial Conduct. 281 So. 2d 21 (1973). In its present form, the first sentence of Canon 1 reads, "An independent and honorable judiciary is indispensable to justice in our society." Code of Judicial Conduct for the State of Florida 6 (2014). Canon 1 instructs judges to observe "high standards of conduct" so that "the integrity and independence of the judiciary may

be preserved." *Ibid.* Canon 2 directs that a judge "shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." *Id.,* at 7. Other provisions prohibit judges from lending the prestige of their offices to private interests, engaging in certain business transactions, and personally participating in soliciting funds for nonprofit organizations. Canons 2B, 5C(3)(b)(i), 5D; *id.,* at 7, 23, 24.

Canon 7C(1) governs fundraising in judicial elections. The Canon, which is based on a provision in the American Bar Association's Model Code of Judicial Conduct, provides:

> "A candidate, including an incumbent judge, for a judicial office that is filled by public election between competing candidates shall not personally solicit campaign funds, or solicit attorneys for publicly stated support, but may establish committees of responsible persons to secure and manage the expenditure of funds for the candidate's campaign and to obtain public statements of support for his or her candidacy. Such committees are not prohibited from soliciting campaign contributions and public support from any person or corporation authorized by law." *Id.,* at 38.

Florida statutes impose additional restrictions on campaign fundraising in judicial elections. Contributors may not donate more than $1,000 per election to a trial court candidate or more than $3,000 per retention election to a Supreme Court justice. Fla. Stat. §106.08(1)(a) (2014). Campaign committee treasurers must file periodic reports disclosing the names of contributors and the amount of each contribution. §106.07.

Judicial candidates can seek guidance about campaign ethics rules from the Florida Judicial Ethics Advisory Committee. The Committee has interpreted Canon 7 to allow a judicial candidate to serve as treasurer of his own

campaign committee, learn the identity of campaign contributors, and send thank you notes to donors. An Aid to Understanding Canon 7, pp. 51–58 (2014).

Like Florida, most other States prohibit judicial candidates from soliciting campaign funds personally, but allow them to raise money through committees. According to the American Bar Association, 30 of the 39 States that elect trial or appellate judges have adopted restrictions similar to Canon 7C(1). Brief for American Bar Association as *Amicus Curiae* 4.

B

Lanell Williams-Yulee, who refers to herself as Yulee, has practiced law in Florida since 1991. In September 2009, she decided to run for a seat on the county court for Hillsborough County, a jurisdiction of about 1.3 million people that includes the city of Tampa. Shortly after filing paperwork to enter the race, Yulee drafted a letter announcing her candidacy. The letter described her experience and desire to "bring fresh ideas and positive solutions to the Judicial bench." App. to Pet. for Cert. 31a. The letter then stated:

> "An early contribution of $25, $50, $100, $250, or $500, made payable to 'Lanell Williams-Yulee Campaign for County Judge', will help raise the initial funds needed to launch the campaign and get our message out to the public. I ask for your support [i]n meeting the primary election fund raiser goals. Thank you in advance for your support." *Id.,* at 32a.

Yulee signed the letter and mailed it to local voters. She also posted the letter on her campaign Web site.

Yulee's bid for the bench did not unfold as she had hoped. She lost the primary to the incumbent judge. Then the Florida Bar filed a complaint against her. As relevant here, the Bar charged her with violating Rule 4–

8.2(b) of the Rules Regulating the Florida Bar. That Rule requires judicial candidates to comply with applicable provisions of Florida's Code of Judicial Conduct, including the ban on personal solicitation of campaign funds in Canon 7C(1).

Yulee admitted that she had signed and sent the fund-raising letter. But she argued that the Bar could not discipline her for that conduct because the First Amendment protects a judicial candidate's right to solicit campaign funds in an election.* The Florida Supreme Court appointed a referee, who held a hearing and recommended a finding of guilt. As a sanction, the referee recommended that Yulee be publicly reprimanded and ordered to pay the costs of the proceeding ($1,860). App. to Pet. for Cert. 19a–25a.

The Florida Supreme Court adopted the referee's recommendations. 138 So. 3d 379 (2014). The court explained that Canon 7C(1) "clearly restricts a judicial candidate's speech" and therefore must be "narrowly tailored to serve a compelling state interest." *Id.,* at 384. The court held that the Canon satisfies that demanding inquiry. First, the court reasoned, prohibiting judicial candidates from personally soliciting funds furthers Florida's compelling interest in "preserving the integrity of [its] judiciary and maintaining the public's confidence in an impartial judiciary." *Ibid.* (internal quotation marks omitted; alteration in original). In the court's view, "personal solicitation of campaign funds, even by mass mailing, raises an appearance of impropriety and calls into question, in the public's mind, the judge's impartiality." *Id.,* at 385. Second, the court concluded that Canon 7C(1)

——————

*Yulee also contended that she had not violated Canon 7C(1), which applies to "a judicial office that is filled by public election between competing candidates," because the incumbent judge had not declared his campaign for reelection at the time she sent her solicitation letter. She has since abandoned that argument.

is narrowly tailored to serve that compelling interest because it "'insulate[s] judicial candidates from the solicitation and receipt of funds while leaving open, ample alternative means for candidates to raise the resources necessary to run their campaigns.'" *Id.,* at 387 (quoting *Simes* v. *Arkansas Judicial Discipline & Disability Comm'n,* 368 Ark. 577, 588, 247 S. W. 3d 876, 883 (2007)).

The Florida Supreme Court acknowledged that some Federal Courts of Appeals—"whose judges have lifetime appointments and thus do not have to engage in fundraising"—had invalidated restrictions similar to Canon 7C(1). 138 So. 3d, at 386, n. 3. But the court found it persuasive that every State Supreme Court that had considered similar fundraising provisions—along with several Federal Courts of Appeals—had upheld the laws against First Amendment challenges. *Id.,* at 386. Florida's chief justice and one associate justice dissented. *Id.,* at 389. We granted certiorari. 573 U. S. ___ (2014).

## II

The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech." The Fourteenth Amendment makes that prohibition applicable to the States. *Stromberg* v. *California,* 283 U. S. 359, 368 (1931). The parties agree that Canon 7C(1) restricts Yulee's speech on the basis of its content by prohibiting her from soliciting contributions to her election campaign. The parties disagree, however, about the level of scrutiny that should govern our review.

We have applied exacting scrutiny to laws restricting the solicitation of contributions to charity, upholding the speech limitations only if they are narrowly tailored to serve a compelling interest. See *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781, 798 (1988); *id.,* at 810 (Rehnquist, C. J., dissenting). As we have explained, noncommercial solicitation "is characteristically

intertwined with informative and perhaps persuasive speech." *Id.,* at 796 (majority opinion) (quoting *Schaumburg* v. *Citizens for Better Environment*, 444 U. S. 620, 632 (1980)). Applying a lesser standard of scrutiny to such speech would threaten "the exercise of rights so vital to the maintenance of democratic institutions." *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147, 161 (1939).

The principles underlying these charitable solicitation cases apply with even greater force here. Before asking for money in her fundraising letter, Yulee explained her fitness for the bench and expressed her vision for the judiciary. Her stated purpose for the solicitation was to get her "message out to the public." App. to Pet. for Cert. 32a. As we have long recognized, speech about public issues and the qualifications of candidates for elected office commands the highest level of First Amendment protection. See *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 223 (1989). Indeed, in our only prior case concerning speech restrictions on a candidate for judicial office, this Court and both parties assumed that strict scrutiny applied. *Republican Party of Minn.* v. *White*, 536 U. S. 765, 774 (2002).

Although the Florida Supreme Court upheld Canon 7C(1) under strict scrutiny, the Florida Bar and several *amici* contend that we should subject the Canon to a more permissive standard: that it be "closely drawn" to match a "sufficiently important interest." *Buckley* v. *Valeo*, 424 U. S. 1, 25 (1976) (*per curiam*). The "closely drawn" standard is a poor fit for this case. The Court adopted that test in *Buckley* to address a claim that campaign contribution limits violated a contributor's "freedom of political association." *Id.*, at 24–25. Here, Yulee does not claim that Canon 7C(1) violates her right to free association; she argues that it violates her right to free speech. And the Florida Bar can hardly dispute that the Canon infringes Yulee's freedom to discuss candidates and public

issues—namely, herself and her qualifications to be a judge. The Bar's call to import the "closely drawn" test from the contribution limit context into a case about solicitation therefore has little avail.

As several of the Bar's *amici* note, we applied the "closely drawn" test to solicitation restrictions in *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 136 (2003), overruled in part by *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310 (2010). But the Court in that case determined that the solicitation restrictions operated primarily to prevent circumvention of the contribution limits, which were the subject of the "closely drawn" test in the first place. 540 U. S., at 138–139. *McConnell* offers no help to the Bar here, because Florida did not adopt Canon 7C(1) as an anticircumvention measure.

In sum, we hold today what we assumed in *White*: A State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest.

## III

The Florida Bar faces a demanding task in defending Canon 7C(1) against Yulee's First Amendment challenge. We have emphasized that "it is the rare case" in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest. *Burson* v. *Freeman*, 504 U. S. 191, 211 (1992) (plurality opinion). But those cases do arise. See *ibid.*; *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 25–39 (2010); *McConnell*, 540 U. S., at 314 (opinion of KENNEDY, J.); cf. *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 237 (1995) ("we wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact'"). Here, Canon 7C(1) advances the State's compelling interest in preserving public confidence in the integrity of the judiciary, and it does so through means narrowly tailored to avoid unnecessarily abridging

speech. This is therefore one of the rare cases in which a speech restriction withstands strict scrutiny.

## A

The Florida Supreme Court adopted Canon 7C(1) to promote the State's interests in "protecting the integrity of the judiciary" and "maintaining the public's confidence in an impartial judiciary." 138 So. 3d, at 385. The way the Canon advances those interests is intuitive: Judges, charged with exercising strict neutrality and independence, cannot supplicate campaign donors without diminishing public confidence in judicial integrity. This principle dates back at least eight centuries to Magna Carta, which proclaimed, "To no one will we sell, to no one will we refuse or delay, right or justice." Cl. 40 (1215), in W. McKechnie, Magna Carta, A Commentary on the Great Charter of King John 395 (2d ed. 1914). The same concept underlies the common law judicial oath, which binds a judge to "do right to all manner of people . . . without fear or favour, affection or ill-will," 10 Encyclopaedia of the Laws of England 105 (2d ed. 1908), and the oath that each of us took to "administer justice without respect to persons, and do equal right to the poor and to the rich," 28 U. S. C. §453. Simply put, Florida and most other States have concluded that the public may lack confidence in a judge's ability to administer justice without fear or favor if he comes to office by asking for favors.

The interest served by Canon 7C(1) has firm support in our precedents. We have recognized the "vital state interest" in safeguarding "public confidence in the fairness and integrity of the nation's elected judges." *Caperton* v. *A. T. Massey Coal Co.*, 556 U. S. 868, 889 (2009) (internal quotation marks omitted). The importance of public confidence in the integrity of judges stems from the place of the judiciary in the government. Unlike the executive or the legislature, the judiciary "has no influence over either the

sword or the purse; . . . neither force nor will but merely judgment." The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (capitalization altered). The judiciary's authority therefore depends in large measure on the public's willingness to respect and follow its decisions. As Justice Frankfurter once put it for the Court, "justice must satisfy the appearance of justice." *Offutt* v. *United States*, 348 U. S. 11, 14 (1954). It follows that public perception of judicial integrity is "a state interest of the highest order." *Caperton*, 556 U. S., at 889 (quoting *White*, 536 U. S., at 793 (KENNEDY, J., concurring)).

The principal dissent observes that bans on judicial candidate solicitation lack a lengthy historical pedigree. *Post,* at 1–2 (opinion of SCALIA, J.). We do not dispute that fact, but it has no relevance here. As the precedent cited by the principal dissent demonstrates, a history and tradition of regulation are important factors in determining whether to recognize "new categories of unprotected speech." *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. ___, ___ (2011) (slip op., at 3); see *post,* at 1. But nobody argues that solicitation of campaign funds by judicial candidates is a category of unprotected speech. As explained above, the First Amendment fully applies to Yulee's speech. The question is instead whether that Amendment permits the particular regulation of speech at issue here.

The parties devote considerable attention to our cases analyzing campaign finance restrictions in political elections. But a State's interest in preserving public confidence in the integrity of its judiciary extends beyond its interest in preventing the appearance of corruption in legislative and executive elections. As we explained in *White*, States may regulate judicial elections differently than they regulate political elections, because the role of judges differs from the role of politicians. 536 U. S., at 783; *id.,* at 805 (GINSBURG, J., dissenting). Politicians are

expected to be appropriately responsive to the preferences of their supporters. Indeed, such "responsiveness is key to the very concept of self-governance through elected officials." *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. \_\_\_, \_\_\_ (2014) (plurality opinion) (slip op., at 39). The same is not true of judges. In deciding cases, a judge is not to follow the preferences of his supporters, or provide any special consideration to his campaign donors. A judge instead must "observe the utmost fairness," striving to be "perfectly and completely independent, with nothing to influence or controul him but God and his conscience." Address of John Marshall, in Proceedings and Debates of the Virginia State Convention of 1829–1830, p. 616 (1830). As in *White*, therefore, our precedents applying the First Amendment to political elections have little bearing on the issues here.

The vast majority of elected judges in States that allow personal solicitation serve with fairness and honor. But "[e]ven if judges were able to refrain from favoring donors, the mere possibility that judges' decisions may be motivated by the desire to repay campaign contributions is likely to undermine the public's confidence in the judiciary." *White*, 536 U. S., at 790 (O'Connor, J., concurring). In the eyes of the public, a judge's personal solicitation could result (even unknowingly) in "a possible temptation . . . which might lead him not to hold the balance nice, clear and true." *Tumey* v. *Ohio*, 273 U. S. 510, 532 (1927). That risk is especially pronounced because most donors are lawyers and litigants who may appear before the judge they are supporting. See A. Bannon, E. Velasco, L. Casey, & L. Reagan, The New Politics of Judicial Elections: 2011–12, p. 15 (2013).

The concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record. But no one denies that it is genuine and compelling. In short, it is the

regrettable but unavoidable appearance that judges who personally ask for money may diminish their integrity that prompted the Supreme Court of Florida and most other States to sever the direct link between judicial candidates and campaign contributors. As the Supreme Court of Oregon explained, "the spectacle of lawyers or potential litigants directly handing over money to judicial candidates should be avoided if the public is to have faith in the impartiality of its judiciary." *In re Fadeley*, 310 Ore. 548, 565, 802 P. 2d 31, 41 (1990). Moreover, personal solicitation by a judicial candidate "inevitably places the solicited individuals in a position to fear retaliation if they fail to financially support that candidate." *Simes*, 368 Ark., at 585, 247 S. W. 3d, at 882. Potential litigants then fear that "the integrity of the judicial system has been compromised, forcing them to search for an attorney in part based upon the criteria of which attorneys have made the obligatory contributions." *Ibid.* A State's decision to elect its judges does not require it to tolerate these risks. The Florida Bar's interest is compelling.

B

Yulee acknowledges the State's compelling interest in judicial integrity. She argues, however, that the Canon's failure to restrict other speech equally damaging to judicial integrity and its appearance undercuts the Bar's position. In particular, she notes that Canon 7C(1) allows a judge's campaign committee to solicit money, which arguably reduces public confidence in the integrity of the judiciary just as much as a judge's personal solicitation. Yulee also points out that Florida permits judicial candidates to write thank you notes to campaign donors, which ensures that candidates know who contributes and who does not.

It is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging *too little*

speech. We have recognized, however, that underinclusiveness can raise "doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U. S., at \_\_\_ (slip op., at 14). In a textbook illustration of that principle, we invalidated a city's ban on ritual animal sacrifices because the city failed to regulate vast swaths of conduct that similarly diminished its asserted interests in public health and animal welfare. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 543–547 (1993).

Underinclusiveness can also reveal that a law does not actually advance a compelling interest. For example, a State's decision to prohibit newspapers, but not electronic media, from releasing the names of juvenile defendants suggested that the law did not advance its stated purpose of protecting youth privacy. *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97, 104–105 (1979).

Although a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding "underinclusiveness limitation." *R. A. V.* v. *St. Paul*, 505 U. S. 377, 387 (1992) (internal quotation marks omitted). A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns. We have accordingly upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests. *Burson*, 504 U. S., at 207; see *McConnell*, 540 U. S., at 207–208; *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 511–512 (1981) (plurality opinion); *Buckley*, 424 U. S., at 105.

Viewed in light of these principles, Canon 7C(1) raises no fatal underinclusivity concerns. The solicitation ban aims squarely at the conduct most likely to undermine public confidence in the integrity of the judiciary: personal requests for money by judges and judicial candidates. The

Canon applies evenhandedly to all judges and judicial candidates, regardless of their viewpoint or chosen means of solicitation. And unlike some laws that we have found impermissibly underinclusive, Canon 7C(1) is not riddled with exceptions. See *City of Ladue* v. *Gilleo*, 512 U. S. 43, 52–53 (1994). Indeed, the Canon contains zero exceptions to its ban on personal solicitation.

Yulee relies heavily on the provision of Canon 7C(1) that allows solicitation by a candidate's campaign committee. But Florida, along with most other States, has reasonably concluded that solicitation by the candidate personally creates a categorically different and more severe risk of undermining public confidence than does solicitation by a campaign committee. The identity of the solicitor matters, as anyone who has encountered a Girl Scout selling cook-ies outside a grocery store can attest. When the judicial candidate himself asks for money, the stakes are higher for all involved. The candidate has personally invested his time and effort in the fundraising appeal; he has placed his name and reputation behind the request. The solicited individual knows that, and also knows that the solicitor might be in a position to singlehandedly make decisions of great weight: The same person who signed the fundraising letter might one day sign the judgment. This dynamic inevitably creates pressure for the recipient to comply, and it does so in a way that solicitation by a third party does not. Just as inevitably, the personal involvement of the candidate in the solicitation creates the public appearance that the candidate will remember who says yes, and who says no.

In short, personal solicitation by judicial candidates implicates a different problem than solicitation by cam-paign committees. However similar the two solicitations may be in substance, a State may conclude that they present markedly different appearances to the public. Florida's choice to allow solicitation by campaign commit-

tees does not undermine its decision to ban solicitation by judges.

Likewise, allowing judicial candidates to write thank you notes to campaign donors does not detract from the State's interest in preserving public confidence in the integrity of the judiciary. Yulee argues that permitting thank you notes heightens the likelihood of actual bias by ensuring that judicial candidates know who supported their campaigns, and ensuring that the supporter knows that the candidate knows. Maybe so. But the State's compelling interest is implicated most directly by the candidate's personal solicitation itself. A failure to ban thank you notes for contributions not solicited by the candidate does not undercut the Bar's rationale.

In addition, the State has a good reason for allowing candidates to write thank you notes and raise money through committees. These accommodations reflect Florida's effort to respect the First Amendment interests of candidates and their contributors—to resolve the "fundamental tension between the ideal character of the judicial office and the real world of electoral politics." *Chisom* v. *Roemer*, 501 U. S. 380, 400 (1991). They belie the principal dissent's suggestion that Canon 7C(1) reflects general "hostility toward judicial campaigning" and has "nothing to do with the appearances created by judges' asking for money." *Post,* at 11. Nothing?

The principal dissent also suggests that Canon 7C(1) is underinclusive because Florida does not ban judicial candidates from asking individuals for personal gifts or loans. *Post,* at 10. But Florida law treats a personal "gift" or "loan" as a campaign contribution if the donor makes it "for the purpose of influencing the results of an election," Fla. Stat. §106.011(5)(a), and Florida's Judicial Qualifications Commission has determined that a judicial candidate violates Canon 7C(1) by personally soliciting such a loan. See *In re Turner*, 76 So. 3d 898, 901–902 (Fla. 2011).

In any event, Florida can ban personal solicitation of campaign funds by judicial candidates without making them obey a comprehensive code to leading an ethical life. Underinclusivity creates a First Amendment concern when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*. See *Florida Star* v. *B. J. F.*, 491 U. S. 524, 540 (1989). The principal dissent offers no basis to conclude that judicial candidates are in the habit of soliciting personal loans, football tickets, or anything of the sort. *Post,* at 10. Even under strict scrutiny, "[t]he First Amendment does not require States to regulate for problems that do not exist." *Burson*, 504 U. S., at 207 (State's regulation of political solicitation around a polling place, but not charitable or commercial solicitation, was not fatally underinclusive under strict scrutiny).

Taken to its logical conclusion, the position advanced by Yulee and the principal dissent is that Florida may ban the solicitation of funds by judicial candidates only if the State bans *all* solicitation of funds in judicial elections. The First Amendment does not put a State to that all-or-nothing choice. We will not punish Florida for leaving open more, rather than fewer, avenues of expression, especially when there is no indication that the selective restriction of speech reflects a pretextual motive.

C

After arguing that Canon 7C(1) violates the First Amendment because it restricts too little speech, Yulee argues that the Canon violates the First Amendment because it restricts too much. In her view, the Canon is not narrowly tailored to advance the State's compelling interest through the least restrictive means. See *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 813 (2000).

By any measure, Canon 7C(1) restricts a narrow slice of speech. A reader of JUSTICE KENNEDY's dissent could be forgiven for concluding that the Court has just upheld a latter-day version of the Alien and Sedition Acts, approving "state censorship" that "locks the First Amendment out," imposes a "gag" on candidates, and inflicts "dead weight" on a "silenced" public debate. *Post*, at 2–4. But in reality, Canon 7C(1) leaves judicial candidates free to discuss any issue with any person at any time. Candidates can write letters, give speeches, and put up billboards. They can contact potential supporters in person, on the phone, or online. They can promote their campaigns on radio, television, or other media. They cannot say, "Please give me money." They can, however, direct their campaign committees to do so. Whatever else may be said of the Canon, it is surely not a "wildly disproportionate restriction upon speech." *Post,* at 1 (SCALIA, J., dissenting).

Indeed, Yulee concedes—and the principal dissent seems to agree, *post,* at 8—that Canon 7C(1) is valid in numerous applications. Yulee acknowledges that Florida can prohibit judges from soliciting money from lawyers and litigants appearing before them. Reply Brief 18. In addition, she says the State "might" be able to ban "direct one-to-one solicitation of lawyers and individuals or businesses that could reasonably appear in the court for which the individual is a candidate." *Ibid.* She also suggests that the Bar could forbid "in person" solicitation by judicial candidates. Tr. of Oral Arg. 7; cf. *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978) (permitting State to ban in person solicitation of clients by lawyers). But Yulee argues that the Canon cannot constitutionally be applied to her chosen form of solicitation: a letter posted online and distributed via mass mailing. No one, she contends, will lose confidence in the integrity of the judiciary based on personal solicitation to such a broad audience.

This argument misperceives the breadth of the compelling interest that underlies Canon 7C(1). Florida has reasonably determined that personal appeals for money by a judicial candidate inherently create an appearance of impropriety that may cause the public to lose confidence in the integrity of the judiciary. That interest may be implicated to varying degrees in particular contexts, but the interest remains whenever the public perceives the judge personally asking for money.

Moreover, the lines Yulee asks us to draw are unworkable. Even under her theory of the case, a mass mailing would create an appearance of impropriety if addressed to a list of all lawyers and litigants with pending cases. So would a speech soliciting contributions from the 100 most frequently appearing attorneys in the jurisdiction. Yulee says she might accept a ban on one-to-one solicitation, but is the public impression really any different if a judicial candidate tries to buttonhole not one prospective donor but two at a time? Ten? Yulee also agrees that in person solicitation creates a problem. But would the public's concern recede if the request for money came in a phone call or a text message?

We decline to wade into this swamp. The First Amendment requires that Canon 7C(1) be narrowly tailored, not that it be "perfectly tailored." *Burson*, 504 U. S., at 209. The impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary. Yulee is of course correct that some personal solicitations raise greater concerns than others. A judge who passes the hat in the courthouse creates a more serious appearance of impropriety than does a judicial candidate who makes a tasteful plea for support on the radio. But most problems arise in greater and lesser gradations, and the First Amendment does not confine a State to addressing evils in their most acute form. See *id.,* at 210. Here, Florida has

concluded that all personal solicitations by judicial candidates create a public appearance that undermines confidence in the integrity of the judiciary; banning all personal solicitations by judicial candidates is narrowly tailored to address that concern.

In considering Yulee's tailoring arguments, we are mindful that most States with elected judges have determined that drawing a line between personal solicitation by candidates and solicitation by committees is necessary to preserve public confidence in the integrity of the judiciary. These considered judgments deserve our respect, especially because they reflect sensitive choices by States in an area central to their own governance—how to select those who "sit as their judges." *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991).

Finally, Yulee contends that Florida can accomplish its compelling interest through the less restrictive means of recusal rules and campaign contribution limits. We disagree. A rule requiring judges to recuse themselves from every case in which a lawyer or litigant made a campaign contribution would disable many jurisdictions. And a flood of postelection recusal motions could "erode public confidence in judicial impartiality" and thereby exacerbate the very appearance problem the State is trying to solve. *Caperton*, 556 U. S., at 891 (ROBERTS, C. J., dissenting). Moreover, the rule that Yulee envisions could create a perverse incentive for litigants to make campaign contributions to judges solely as a means to trigger their later recusal—a form of peremptory strike against a judge that would enable transparent forum shopping.

As for campaign contribution limits, Florida already applies them to judicial elections. Fla. Stat. §106.08(1)(a). A State may decide that the threat to public confidence created by personal solicitation exists apart from the amount of money that a judge or judicial candidate seeks. Even if Florida decreased its contribution limit, the ap-

pearance that judges who personally solicit funds might improperly favor their campaign donors would remain. Although the Court has held that contribution limits advance the interest in preventing *quid pro quo* corruption and its appearance in political elections, we have never held that adopting contribution limits precludes a State from pursuing its compelling interests through additional means. And in any event, a State has compelling interests in regulating judicial elections that extend beyond its interests in regulating political elections, because judges are not politicians.

In sum, because Canon 7C(1) is narrowly tailored to serve a compelling government interest, the First Amendment poses no obstacle to its enforcement in this case. As a result of our decision, Florida may continue to prohibit judicial candidates from personally soliciting campaign funds, while allowing them to raise money through committees and to otherwise communicate their electoral messages in practically any way. The principal dissent faults us for not answering a slew of broader questions, such as whether Florida may cap a judicial candidate's spending or ban independent expenditures by corporations. *Post,* at 8–9. Yulee has not asked these questions, and for good reason—they are far afield from the narrow regulation actually at issue in this case.

We likewise have no cause to consider whether the citizens of States that elect their judges have decided anything about the "oracular sanctity of judges" or whether judges are due "a hearty helping of humble pie." *Post,* at 12. The principal dissent could be right that the decision to adopt judicial elections "probably springs," at least in part, from a desire to make judges more accountable to the public, *ibid.,* although the history on this matter is more complicated. See J. Shugerman, The People's Courts, at 5 (arguing that States adopted judicial elections to increase judicial independence). In any event, it is a

long way from general notions of judicial accountability to the principal dissent's view, which evokes nothing so much as Delacroix's painting of Liberty leading a determined band of *citoyens*, this time against a robed aristocracy scurrying to shore up the ramparts of the judicial castle through disingenuous ethical rules. We claim no similar insight into the People's passions, hazard no assertions about ulterior motives of those who promulgated Canon 7C(1), and firmly reject the charge of a deceptive "pose of neutrality" on the part of those who uphold it. *Post,* at 12.

*     *     *

The desirability of judicial elections is a question that has sparked disagreement for more than 200 years. Hamilton believed that appointing judges to positions with life tenure constituted "the best expedient which can be devised in any government to secure a steady, upright, and impartial administration of the laws." The Federalist No. 78, at 465. Jefferson thought that making judges "dependent on none but themselves" ran counter to the principle of "a government founded on the public will." 12 The Works of Thomas Jefferson 5 (P. Ford ed. 1905). The federal courts reflect the view of Hamilton; most States have sided with Jefferson. Both methods have given our Nation jurists of wisdom and rectitude who have devoted themselves to maintaining "the public's respect . . . and a reserve of public goodwill, without becoming subservient to public opinion." Rehnquist, Judicial Independence, 38 U. Rich. L. Rev. 579, 596 (2004).

It is not our place to resolve this enduring debate. Our limited task is to apply the Constitution to the question presented in this case. Judicial candidates have a First Amendment right to speak in support of their campaigns. States have a compelling interest in preserving public confidence in their judiciaries. When the State adopts a narrowly tailored restriction like the one at issue here,

those principles do not conflict.  A State's decision to elect judges does not compel it to compromise public confidence in their integrity.

   The judgment of the Florida Supreme Court is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1499

_____

## LANELL WILLIAMS-YULEE, PETITIONER *v.* THE FLORIDA BAR

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[April 29, 2015]

JUSTICE BREYER, concurring.

As I have previously said, I view this Court's doctrine referring to tiers of scrutiny as guidelines informing our approach to the case at hand, not tests to be mechanically applied. See, *e.g., United States* v. *Alvarez*, 567 U. S. \_\_\_, \_\_\_ (2012) (BREYER, J., concurring in judgment) (slip op., at 1–3); *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 400–403 (2000) (BREYER, J., concurring). On that understanding, I join the Court's opinion.

1

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1499

_____

## LANELL WILLIAMS-YULEE, PETITIONER *v.* THE FLORIDA BAR

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
FLORIDA

[April 29, 2015]

JUSTICE GINSBURG, with whom JUSTICE BREYER joins as to Part II, concurring in part and concurring in the judgment.

### I

I join the Court's opinion save for Part II. As explained in my dissenting opinion in *Republican Party of Minnesota* v. *White*, 536 U. S. 765, 803 (2002), I would not apply exacting scrutiny to a State's endeavor sensibly to "differentiate elections for political offices . . . , from elections designed to select those whose office it is to administer justice without respect to persons," *id.,* at 805.

### II

I write separately to reiterate the substantial latitude, in my view, States should possess to enact campaign-finance rules geared to judicial elections. "Judges," the Court rightly recognizes, "are not politicians," *ante,* at 1, so "States may regulate judicial elections differently than they regulate political elections," *ante,* at 10. And because "the role of judges differs from the role of politicians," *ibid.,* this Court's "precedents applying the First Amendment to political elections [should] have little bearing" on elections to judicial office. *Ante,* at 11.

The Court's recent campaign-finance decisions, trained on political actors, should not hold sway for judicial elec-

tions. In *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310 (2010), the Court invalidated a campaign-finance restriction designed to check the outsized influence of monied interests in politics. Addressing the Government's asserted interest in preventing "influence over or access to elected officials," *id.,* at 359, the Court observed that "[f]avoritism and influence" are inevitable "in *representative* politics." *Ibid.* (quoting *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 297 (KENNEDY, J., concurring in judgment in part and dissenting in part); emphasis added). A plurality of the Court responded similarly in *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. ___ (2014), when it addressed the prospect that wealthy donors would have ready access to, and could therefore influence, elected policymakers. "[A] central feature of democracy," the plurality maintained, is "that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *Id.*, at ___ (slip op., at 2).

For reasons spelled out in the dissenting opinions in *Citizens United* and *McCutcheon*, I would have upheld the legislation there at issue. But even if one agrees with those judgments, they are geared to elections for representative posts, and should have "little bearing" on judicial elections. *Ante,* at 11. "Favoritism," *i.e.,* partiality, if inevitable in the political arena, is disqualifying in the judiciary's domain. See *Marshall* v. *Jerrico, Inc.*, 446 U. S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."). Unlike politicians, judges are not "expected to be responsive to [the] concerns" of constituents. *McCutcheon*, 572 U. S., at ___ (plurality opinion) (slip op., at 2). Instead, "it is the business of judges to be indifferent to popularity." *Chisom* v. *Roemer*, 501 U. S. 380, 401, n. 29 (1991) (internal quotation marks omitted).

States may therefore impose different campaign-finance

rules for judicial elections than for political elections. Experience illustrates why States may wish to do so. When the political campaign-finance apparatus is applied to judicial elections, the distinction of judges from politicians dims. Donors, who gain audience and influence through contributions to political campaigns, anticipate that investment in campaigns for judicial office will yield similar returns. Elected judges understand this dynamic. As Ohio Supreme Court Justice Paul Pfeifer put it: "Whether they succeed or not," campaign contributors "mean to be buying a vote." Liptak & Roberts, Campaign Cash Mirrors a High Court's Rulings, N. Y. Times, Oct. 1, 2006, pp. A1, A22 (internal quotation marks omitted).

In recent years, moreover, issue-oriented organizations and political action committees have spent millions of dollars opposing the reelection of judges whose decisions do not tow a party line or are alleged to be out of step with public opinion. Following the Iowa Supreme Court's 2009 invalidation of the State's same-sex marriage ban, for example, national organizations poured money into a successful campaign to remove three justices from that Court. J. Shugerman, The People's Courts: Pursuing Judicial Independence in America 3 (2012). Attack advertisements funded by issue or politically driven organizations portrayed the justices as political actors; they lambasted the Iowa Supreme Court for "usurp[ing] the will of voters." A. Skaggs, M. da Silva, L. Casey, & C. Hall, The New Politics of Judicial Elections 2009–10, p. 9 (C. Hall ed. 2011) (internal quotation marks omitted).

Similarly portraying judges as belonging to another political branch, huge amounts have been spent on advertisements opposing retention of judges because they rendered unpopular decisions in favor of criminal defendants. D. Goldberg, S. Samis, E. Bender, & R. Weiss, The New Politics of Judicial Elections 2004, pp. 5, 10–11 (J. Rutledge ed. 2005) (hereinafter Goldberg). In North Caro-

lina, for example, in 2014, a political action committee aired "a widely condemned TV spot accusing [North Carolina Supreme Court Justice Robin] Hudson of being 'soft' on child-molesters." Oliphant, When Judges Go Courting, National Journal Magazine, Oct. 18, 2014, p. 28. And in West Virginia, as described in *Caperton* v. *A. T. Massey Coal Co.,* 556 U. S. 868, 873 (2009), coal executive Don Blankenship lavishly funded a political action committee called "And For The Sake Of The Kids." That group bought advertisements accusing Justice Warren McGraw of freeing a "child rapist" and allowing that "rapist" to "work as a janitor at a West Virginia school." Goldberg 4; see A. Bannon, E. Velasco, L. Casey, & L. Reagan, The New Politics of Judicial Elections 2011–12, p. 22 (L. Kinney and P. Hardin eds. 2013) (reporting that in 2011 and 2012, interest-oriented groups were 22 times more likely to purchase an "attack" advertisement than were judicial candidates themselves).

Disproportionate spending to influence court judgments threatens both the appearance and actuality of judicial independence. Numerous studies report that the money pressure groups spend on judicial elections "can affect judicial decision-making across a broad range of cases." Brief for Professors of Law, Economics, and Political Science as *Amici Curiae* 14 (hereinafter Professors' Brief), see *id.,* at 5–17; J. Shepherd & M. Kang, Skewed Justice 1 (2014), available at http://skewedjustice.org (All Internet materials as visited Apr. 24, 2015, and included in Clerk of Court's case file) (finding that a recent "explosion in spending on television attack advertisements . . . has made courts less likely to rule in favor of defendants in criminal appeals").

How does the electorate perceive outsized spending on judicial elections? Multiple surveys over the past 13 years indicate that voters overwhelmingly believe direct contributions to judges' campaigns have at least "some influ-

ence" on judicial decisionmaking. See Professors' Brief 23 (citing polls). Disquieting as well, in response to a recent poll, 87% of voters stated that advertisements purchased by interest groups during judicial elections can have either "some" or "a great deal of influence" on an elected "judge's later decisions." Justice at Stake/Brennan Center National Poll 3, Question 9 (Oct. 22–24, 2013) (conducted by 20/20 Insight LLC), available at http://www.justiceatstake.org/file.cfm/media/news/toplines 337_B2D51323DC5D0.pdf.

"A State's decision to elect its judges does not require it to tolerate these risks." *Ante,* at 12. What may be true of happy families, L. Tolstoy, Anna Karenina 1 (R. Pevear and L. Volokhonsky transls. 2000) ("All happy families are alike"), or of roses, G. Stein, Sacred Emily, in Geography and Plays 178, 187 (1922) (reprint 1968) ("Rose is a rose is a rose is a rose"), does not hold true in elections of every kind. States should not be put to the polar choices of either equating judicial elections to political elections, or else abandoning public participation in the selection of judges altogether. Instead, States should have leeway to "balance the constitutional interests in judicial integrity and free expression within the unique setting of an elected judiciary." *White*, 536 U. S., at 821 (GINSBURG, J., dissenting).

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1499

_____

## LANELL WILLIAMS-YULEE, PETITIONER *v.* THE FLORIDA BAR

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
FLORIDA

[April 29, 2015]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

An ethics canon adopted by the Florida Supreme Court bans a candidate in a judicial election from asking anyone, under any circumstances, for a contribution to his campaign. Faithful application of our precedents would have made short work of this wildly disproportionate restriction upon speech. Intent upon upholding the Canon, however, the Court flattens one settled First Amendment principle after another.

I

The first axiom of the First Amendment is this: As a general rule, the state has no power to ban speech on the basis of its content. One need not equate judges with politicians to see that this principle does not grow weaker merely because the censored speech is a judicial candidate's request for a campaign contribution. Our cases hold that speech enjoys the full protection of the First Amendment unless a widespread and longstanding tradition ratifies its regulation. *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 3). No such tradition looms here. Georgia became the first State to elect its judges in 1812, and judicial elections had spread to a large majority of the States by the time of the Civil

War. *Republican Party of Minn.* v. *White*, 536 U. S. 765, 785 (2002). Yet there appears to have been no regulation of judicial candidates' speech throughout the 19th and early 20th centuries. *Ibid.* The American Bar Association first proposed ethics rules concerning speech of judicial candidates in 1924, but these rules did not achieve widespread adoption until after the Second World War. *Id.,* at 786.

Rules against soliciting campaign contributions arrived more recently still. The ABA first proposed a canon advising against it in 1972, and a canon prohibiting it only in 1990. See Brief for American Bar Association as *Amicus Curiae* 2–4. Even now, 9 of the 39 States that elect judges allow judicial candidates to ask for campaign contributions. See *id.,* at 4. In the absence of any long-settled custom about judicial candidates' speech in general or their solicitations in particular, we have no basis for relaxing the rules that normally apply to laws that suppress speech because of content.

One likewise need not equate judges with politicians to see that the electoral setting calls for all the more vigilance in ensuring observance of the First Amendment. When a candidate asks someone for a campaign contribution, he tends (as the principal opinion acknowledges) also to talk about his qualifications for office and his views on public issues. *Ante,* at 6–7 (plurality opinion). This expression lies at the heart of what the First Amendment is meant to protect. In addition, banning candidates from asking for money personally "favors some candidates over others—incumbent judges (who benefit from their current status) over non-judicial candidates, the well-to-do (who may not need to raise any money at all) over lower-income candidates, and the well-connected (who have an army of potential fundraisers) over outsiders." *Carey* v. *Wolnitzek*, 614 F. 3d 189, 204 (CA6 2010). This danger of legislated (or judicially imposed) favoritism is the very reason the

First Amendment exists.

Because Canon 7C(1) restricts fully protected speech on the basis of content, it presumptively violates the First Amendment. We may uphold it only if the State meets its burden of showing that the Canon survives strict scrutiny—that is to say, only if it shows that the Canon is narrowly tailored to serve a compelling interest. I do not for a moment question the Court's conclusion that States have different compelling interests when regulating judicial elections than when regulating political ones. Unlike a legislator, a judge must be impartial—without bias for or against any party or attorney who comes before him. I accept for the sake of argument that States have a compelling interest in ensuring that its judges are *seen* to be impartial. I will likewise assume that a judicial candidate's request to a litigant or attorney presents a danger of coercion that a political candidate's request to a constituent does not. But Canon 7C(1) does not narrowly target concerns about impartiality or its appearance; it applies even when the person asked for a financial contribution has no chance of ever appearing in the candidate's court. And Florida does not invoke concerns about coercion, presumably because the Canon bans solicitations regardless of whether their object is a lawyer, litigant, or other person vulnerable to judicial pressure. So Canon 7C(1) fails exacting scrutiny and infringes the First Amendment. This case should have been just that straightforward.

## II

The Court concludes that Florida may prohibit personal solicitations by judicial candidates as a means of preserving "public confidence in the integrity of the judiciary." *Ante,* at 8. It purports to reach this destination by applying strict scrutiny, but it would be more accurate to say that it does so by applying the appearance of strict

scrutiny.

## A

The first sign that mischief is afoot comes when the Court describes Florida's compelling interest. The State must first identify its objective with precision before one can tell whether that interest is compelling and whether the speech restriction narrowly targets it. In *White*, for example, the Court did not allow a State to invoke hazy concerns about judicial impartiality in justification of an ethics rule against judicial candidates' announcing their positions on legal issues. 536 U. S., at 775. The Court instead separately analyzed the State's concerns about judges' bias against parties, preconceptions on legal issues, and openmindedness, and explained why each concern (and each for a different reason) did not suffice to sustain the rule. *Id.,* at 775–780.

In stark contrast to *White*, the Court today relies on Florida's invocation of an ill-defined interest in "public confidence in judicial integrity." The Court at first suggests that "judicial integrity" involves the "ability to administer justice without fear or favor." *Ante,* at 9. As its opinion unfolds, however, today's concept of judicial integrity turns out to be "a mere thing of wax in the hands of the judiciary, which they may twist, and shape into any form they please." 12 The Works of Thomas Jefferson 137 (P. Ford ed. 1905). When the Court explains how solicitation undermines confidence in judicial integrity, integrity starts to sound like saintliness. It involves independence from any "'*possible* temptation'" that "'*might* lead'" the judge, "even unknowingly," to favor one party. *Ante,* at 11 (emphasis added). When the Court turns to distinguishing in-person solicitation from solicitation by proxy, the any-possible-temptation standard no longer helps and thus drops out. The critical factors instead become the "pressure" a listener feels during a solicitation and the

"appearance that the candidate will remember who says yes, and who says no." *Ante,* at 14. But when it comes time to explain Florida's decision to allow candidates to write thank-you notes, the "appearance that the candidate . . . remember[s] who says yes" gets nary a mention. *Ante,* at 14–15. And when the Court confronts Florida's decision to prohibit mass-mailed solicitations, concern about pressure fades away. *Ante,* at 18. More outrageous still, the Court at times molds the interest in the perception that judges have integrity into an interest in the perception that judges do not solicit—for example when it says, "all personal solicitations by judicial candidates create a public appearance that undermines confidence in the integrity of the judiciary; banning all personal solicitations by judicial candidates is narrowly tailored to address that concern." *Ante,* at 19. This is not strict scrutiny; it is sleight of hand.

B

The Court's twistifications have not come to an end; indeed, they are just beginning. In order to uphold Canon 7C(1) under strict scrutiny, Florida must do more than point to a vital public objective brooding overhead. The State must also meet a difficult burden of demonstrating that the speech restriction substantially advances the claimed objective. The State "bears the risk of uncertainty," so "ambiguous proof will not suffice." *Entertainment Merchants,* 564 U. S., at ___ (slip op., at 12). In an arresting illustration, this Court held that a law punishing lies about winning military decorations like the Congressional Medal of Honor failed exacting scrutiny, because the Government could not satisfy its "heavy burden" of proving that "the public's general perception of military awards is diluted by false claims." *United States* v. *Alvarez,* 567 U. S. ___, ___ (2012) (plurality opinion) (slip op., at 14).

Now that we have a case about the public's perception of judicial honor rather than its perception of military honors, the Justices of this Court change the rules. The Court announces, on the basis of its "intuiti[on]," that allowing personal solicitations will make litigants worry that "'judges' decisions may be motivated by the desire to repay campaign contributions.'" *Ante,* at 11. But this case is not about whether Yulee has the right to receive campaign contributions. It is about whether she has the right to *ask* for campaign contributions that Florida's statutory law already allows her to receive. Florida bears the burden of showing that banning *requests* for lawful contributions will improve public confidence in judges—not just a little bit, but significantly, because "the Government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Entertainment Merchants*, *supra*, at ___, n. 9 (slip op., at 16, n. 9).

Neither the Court nor the State identifies the slightest evidence that banning requests for contributions will substantially improve public trust in judges. Nor does common sense make this happy forecast obvious. The concept of judicial integrity "dates back at least eight centuries," *ante,* at 9, and judicial elections in America date back more than two centuries, *supra,* at 1—but rules against personal solicitations date back only to 1972, *supra,* at 2. The peaceful coexistence of judicial elections and personal solicitations for most of our history calls into doubt any claim that allowing personal solicitations would imperil public faith in judges. Many States allow judicial candidates to ask for contributions even today, but nobody suggests that public confidence in judges fares worse in these jurisdictions than elsewhere. And in any event, if candidates' appeals for money are "'characteristically intertwined'" with discussion of qualifications and views on public issues, *ante,* at 7 (plurality opinion), how can the Court be so sure that the public will regard them as im-

proprieties rather than as legitimate instances of campaigning? In the final analysis, Florida comes nowhere near making the convincing demonstration required by our cases that the speech restriction in this case substantially advances its objective.

## C

But suppose we play along with the premise that prohibiting solicitations will significantly improve the public reputation of judges. Even then, Florida must show that the ban restricts no more speech than necessary to achieve the objective. See *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 126 (1989).

Canon 7C(1) falls miles short of satisfying this requirement. The Court seems to accept Florida's claim that solicitations erode public confidence by creating the perception that judges are selling justice to lawyers and litigants. *Ante,* at 9. Yet the Canon prohibits candidates from asking for money from *anybody*—even from someone who is neither lawyer nor litigant, even from someone who (because of recusal rules) cannot possibly appear before the candidate as lawyer or litigant. Yulee thus may not call up an old friend, a cousin, or even her parents to ask for a donation to her campaign. The State has not come up with a plausible explanation of how soliciting someone who has no chance of appearing in the candidate's court will diminish public confidence in judges.

No less important, Canon 7C(1) bans candidates from asking for contributions even in messages that do not target any listener in particular—mass-mailed letters, flyers posted on telephone poles, speeches to large gatherings, and Web sites addressed to the general public. Messages like these do not share the features that lead the Court to pronounce personal solicitations a menace to public confidence in the judiciary. Consider online solicitations. They avoid "'the spectacle of lawyers or potential

litigants directly handing over money to judicial candi-
dates,'" *ante,* at 12. People who come across online solici-
tations do not feel "pressure" to comply with the request,
*ante,* at 14. Nor does the candidate's signature on the
online solicitation suggest "that the candidate will re-
member who says yes, and who says no," *ibid.* Yet Canon
7C(1) prohibits these and similar solicitations anyway.
This tailoring is as narrow as the Court's scrutiny is strict.

Perhaps sensing the fragility of the initial claim that *all*
solicitations threaten public confidence in judges, the
Court argues that "the lines Yulee asks [it] to draw are
unworkable." *Ante,* at 18. That is a difficulty of the
Court's own imagination. In reality, the Court could have
chosen from a whole spectrum of workable rules. It could
have held that States may regulate no more than solicita-
tion of participants in pending cases, or solicitation of
people who are likely to appear in the candidate's court, or
even solicitation of any lawyer or litigant. And it could
have ruled that candidates have the right to make fund-
raising appeals that are not directed to any particular
listener (like requests in mass-mailed letters), or at least
fundraising appeals plainly directed to the general public
(like requests placed online). The Supreme Court of Flor-
ida has made similar accommodations in other settings. It
allows sitting judges to solicit memberships in civic organ-
izations if (among other things) the solicitee is not "likely
ever to appear before the court on which the judge serves."
Code of Judicial Conduct for the State of Florida 23 (2014)
(Judicial Conduct Code). And it allows sitting judges to
accept gifts if (among other things) "the donor is not a
party or other person . . . whose interests have come or are
likely to come before the judge." *Id.,* at 24. It is not too
much to ask that the State show election speech similar
consideration.

The Court's accusation of unworkability also suffers
from a bit of a pot-kettle problem. Consider the many

real-world questions left open by today's decision. Does the First Amendment permit restricting a candidate's appearing at an event where somebody *else* asks for campaign funds on his behalf? See Florida Judicial Ethics Advisory Committee Opinion No. 2012–14 (JEAC Op.). Does it permit prohibiting the candidate's *family* from making personal solicitations? See *ibid.* Does it allow prohibiting the candidate from participating in the creation of a Web site that solicits funds, even if the candidate's name does not appear next to the request? See JEAC Op. No. 2008–11. More broadly, could Florida ban thank-you notes to donors? Cap a candidate's campaign spending? Restrict independent spending by people other than the candidate? Ban independent spending by corporations? And how, by the way, are judges supposed to decide whether these measures promote public confidence in judicial integrity, when the Court does not even have a consistent theory about what it means by "judicial integrity"? For the Court to wring its hands about workability under these circumstances is more than one should have to bear.

## D

Even if Florida could show that banning all personal appeals for campaign funds is necessary to protect public confidence in judicial integrity, the Court must overpower one last sentinel of free speech before it can uphold Canon 7C(1). Among its other functions, the First Amendment is a kind of Equal Protection Clause for ideas. The state ordinarily may not regulate one message because it harms a government interest yet refuse to regulate other messages that impair the interest in a comparable way. Applying this principle, we invalidated a law that prohibited picketing dwellings but made an exception for picketing about labor issues; the State could not show that labor picketing harmed its asserted interest in residential pri-

vacy any less than other kinds of picketing. *Carey* v. *Brown*, 447 U. S. 455, 464–465 (1980). In another case, we set aside a ban on showing movies containing nudity in drive-in theaters, because the government did not demonstrate that movies with nude scenes would distract passing drivers any more than, say, movies with violent scenes. *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 214–215 (1975).

The Court's decision disregards these principles. The Court tells us that "all personal solicitations by judicial candidates create a public appearance that undermines confidence in the integrity of the judiciary." *Ante,* at 19. But Canon 7C(1) does not restrict *all* personal solicitations; it restricts only personal solicitations related to campaigns. The part of the Canon challenged here prohibits personal pleas for "campaign funds," and the Canon elsewhere prohibits personal appeals to attorneys for "publicly stated support." Judicial Conduct Code 38. So although Canon 7C(1) prevents Yulee from asking a lawyer for a few dollars to help her buy campaign pamphlets, it does not prevent her asking the same lawyer for a personal loan, access to his law firm's luxury suite at the local football stadium, or even a donation to help her fight the Florida Bar's charges. What could possibly justify these distinctions? Surely the Court does not believe that requests for campaign favors erode public confidence in a way that requests for favors unrelated to elections do not. Could anyone say with a straight face that it looks *worse* for a candidate to say "please give my campaign $25" than to say "please give *me* $25"?*

———————

*Neither Florida nor the Court identifies any other ethics rule that would prevent candidates like Yulee from asking for favors unrelated to elections, and I know of none. The Supreme Court of Florida has adopted various rules restricting *sitting judges'* solicitation and acceptance of favors, but these rules do not bind challengers like Yulee.

Fumbling around for a fig-leaf, the Court says that "the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Ante,* at 13. This analysis elides the distinction between selectivity on the basis of content and selectivity on other grounds. Because the First Amendment does not prohibit underinclusiveness as such, lawmakers may target a problem only at certain times or in certain places. Because the First Amendment *does* prohibit content discrimination as such, lawmakers may *not* target a problem only in certain messages. Explaining this distinction, we have said that the First Amendment would allow banning obscenity "only in certain media or markets" but would preclude banning "only that obscenity which includes offensive political messages." *R. A. V.* v. *St. Paul,* 505 U. S. 377, 387–388 (1992) (emphasis deleted). This case involves selectivity on the basis of content. The Florida Supreme Court has decided to eliminate the appearances associated with "personal appeals for money," *ante,* at 18, when the appeals seek money for a campaign but not when the appeals seek money for other purposes. That distinction violates the First Amendment. See *Erznoznik, supra,* at 215.

Even on the Court's own terms, Canon 7C(1) cannot stand. The Court concedes that "underinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes.'" *Ante,* at 13. Canon 7C(1)'s scope suggests that it has nothing to do with the appearances created by judges' asking for money, and everything to do with hostility toward judicial campaign-

---

See, *e.g.,* Canon 4D(2)(a), Judicial Conduct Code 18–19 ("A judge as [a member or officer of an organization] . . . shall not personally or directly participate in the solicitation of funds . . . "); Canon 5D(5), *id.,* at 24 ("A judge shall not accept . . . a gift, bequest, favor or loan . . ."); JEAC Op. No. 2010–14 ("[J]udicial candidates are only governed by Canon 7, and not by the remainder of the Code of Judicial Conduct").

ing.  How else to explain the Florida Supreme Court's decision to ban *all* personal appeals for campaign funds (even when the solicitee could never appear before the candidate), but to tolerate appeals for other kinds of funds (even when the solicitee will surely appear before the candidate)?  It should come as no surprise that the ABA, whose model rules the Florida Supreme Court followed when framing Canon 7C(1), opposes judicial elections— preferring instead a system in which (surprise!) a commit- tee of lawyers proposes candidates from among whom the Governor must make his selection.  See *White*, 536 U. S., at 787.

The Court tries to strike a pose of neutrality between appointment and election of judges, but no one should be deceived.  A Court that sees impropriety in a candidate's request for *any* contributions to his election campaign does not much like judicial selection by the people.  One cannot have judicial elections without judicial campaigns, and judicial campaigns without funds for campaigning, and funds for campaigning without asking for them.  When a society decides that its judges should be elected, it neces- sarily decides that selection by the people is more im- portant than the oracular sanctity of judges, their immun- ity from the (shudder!) indignity of begging for funds, and their exemption from those shadows of impropriety that fall over the proletarian public officials who must run for office.  A free society, accustomed to electing its rulers, does not much care whether the rulers operate through statute and executive order, or through judicial distortion of statute, executive order, and constitution.  The prescrip- tion that judges be elected probably springs from the people's realization that their judges can become their rulers—and (it must be said) from just a deep-down feel- ing that members of the Third Branch will profit from a hearty helping of humble pie, and from a severe reduction of their great remove from the (ugh!) People.  (It should

not be thought that I myself harbor such irreverent and revolutionary feelings; but I think it likely—and year by year more likely—that those who favor the election of judges do so.)  In any case, hostility to campaigning by judges entitles the people of Florida to amend their Constitution to replace judicial elections with the selection of judges by lawyers' committees; it does not entitle the Florida Supreme Court to adopt, or this Court to endorse, a rule of judicial conduct that abridges candidates' speech in the judicial elections that the Florida Constitution prescribes.

*      *      *

This Court has not been shy to enforce the First Amendment in recent Terms—even in cases that do not involve election speech.  It has accorded robust protection to depictions of animal torture, sale of violent video games to children, and lies about having won military medals. See *United States* v. *Stevens*, 559 U. S. 460 (2010); *Entertainment Merchants,* 564 U. S. \_\_\_; *Alvarez*, 567 U. S. \_\_\_. Who would have thought that the same Court would today exert such heroic efforts to save so plain an abridgement of the freedom of speech?  It is no great mystery what is going on here.  The judges of this Court, like the judges of the Supreme Court of Florida who promulgated Canon 7C(1), evidently consider the preservation of public respect for the courts a policy objective of the highest order.  So it is—but so too are preventing animal torture, protecting the innocence of children, and honoring valiant soldiers. The Court did not relax the Constitution's guarantee of freedom of speech when legislatures pursued those goals; it should not relax the guarantee when the Supreme Court of Florida pursues this one.  The First Amendment is not abridged for the benefit of the Brotherhood of the Robe.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1499

_____

## LANELL WILLIAMS-YULEE, PETITIONER *v.* THE FLORIDA BAR

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[April 29, 2015]

JUSTICE KENNEDY, dissenting.

The dissenting opinion by JUSTICE SCALIA gives a full and complete explanation of the reasons why the Court's opinion contradicts settled First Amendment principles. This separate dissent is written to underscore the irony in the Court's having concluded that the very First Amendment protections judges must enforce should be lessened when a judicial candidate's own speech is at issue. It is written to underscore, too, the irony in the Court's having weakened the rigors of the First Amendment in a case concerning elections, a paradigmatic forum for speech and a process intended to protect freedom in so many other manifestations.

First Amendment protections are both personal and structural. Free speech begins with the right of each person to think and then to express his or her own ideas. Protecting this personal sphere of intellect and conscience, in turn, creates structural safeguards for many of the processes that define a free society. The individual speech here is political speech. The process is a fair election. These realms ought to be the last place, not the first, for the Court to allow unprecedented content-based restrictions on speech. See *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 272 (1971) (the First Amendment has its "fullest and most urgent application precisely to the conduct of

campaigns for political office"). As James Madison observed: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. [A] people who mean to be their own Governors, must arm themselves with the power which knowledge gives." Letter to William T. Berry (Aug. 4, 1822), in J. Madison, Writings 790 (J. Rakove ed. 1999). The Court's decision in this case imperils the content neutrality essential both for individual speech and the election process.

With all due respect for the Court, it seems fair and necessary to say its decision rests on two premises, neither one correct. One premise is that in certain elections—here an election to choose the best qualified judge—the public lacks the necessary judgment to make an informed choice. Instead, the State must protect voters by altering the usual dynamics of free speech. The other premise is that since judges should be accorded special respect and dignity, their election can be subject to certain content-based rules that would be unacceptable in other elections. In my respectful view neither premise can justify the speech restriction at issue here. Although States have a compelling interest in seeking to ensure the appearance and the reality of an impartial judiciary, it does not follow that the State may alter basic First Amendment principles in pursuing that goal. See *Republican Party of Minn.* v. *White*, 536 U. S. 765, 788 (2002).

While any number of troubling consequences will follow from the Court's ruling, a simple example can suffice to illustrate the dead weight its decision now ties to public debate. Assume a judge retires, and two honest lawyers, Doe and Roe, seek the vacant position. Doe is a respected, prominent lawyer who has been active in the community and is well known to business and civic leaders. Roe, a lawyer of extraordinary ability and high ethical standards, keeps a low profile. As soon as Doe announces his or her

candidacy, a campaign committee organizes of its own accord and begins raising funds. But few know or hear about Roe's potential candidacy, and no one with resources or connections is available to assist in raising the funds necessary for even a modest plan to speak to the electorate. Today the Court says the State can censor Roe's speech, imposing a gag on his or her request for funds, no matter how close Roe is to the potential benefactor or donor. The result is that Roe's personal freedom, the right of speech, is cut off by the State.

The First Amendment consequences of the Court's ruling do not end with its denial of the individual's right to speak. For the very purpose of the candidate's fundraising was to facilitate a larger speech process: an election campaign. By cutting off one candidate's personal freedom to speak, the broader campaign debate that might have followed—a debate that might have been informed by new ideas and insights from both candidates—now is silenced.

Elections are a paradigmatic forum for speech. Though present day campaign rhetoric all too often might thwart or obscure deliberative discourse, the idea of elections is that voters can engage in, or at least consider, a principled debate. That debate can be a means to find consensus for a civic course that is prudent and wise. This pertains both to issues and to the choice of elected officials. The First Amendment seeks to make the idea of discussion, open debate, and consensus-building a reality. But the Court decides otherwise. The Court locks the First Amendment out.

Whether an election is the best way to choose a judge is itself the subject of fair debate. But once the people of a State choose to have elections, the First Amendment protects the candidate's right to speak and the public's ensuing right to open and robust debate. See *ibid.* One advantage of judicial elections is the opportunity offered for the public to become more knowledgeable about their

courts and their law. This might stimulate discourse over the requisite and highest ethical standards for the judiciary, including whether the people should elect a judge who personally solicits campaign funds. Yet now that teaching process is hindered by state censorship. By allowing the State's speech restriction, the Court undermines the educational process that free speech in elections should facilitate.

It is not within our Nation's First Amendment tradition to abridge speech simply because the government believes a question is too difficult or too profound for voters. If the State is concerned about unethical campaign practices, it need not revert to the assumption that voters themselves are insensitive to ethics. Judicial elections were created to enable citizens to decide for themselves which judges are best qualified and which are most likely to "stand by the constitution of the State against the encroachment of power." Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of New York 672 (1846). The Court should not now presume citizens are unequipped for that task when it comes to judging for themselves who should judge them.

If there is concern about principled, decent, and thoughtful discourse in election campaigns, the First Amendment provides the answer. That answer is more speech. See, *e.g., Whitney* v. *California,* 274 U. S. 357, 377 (1927) (Brandeis, J., concurring) (when the government objects to speech, "the remedy to be applied is more speech, not enforced silence"). For example, candidates might themselves agree to appoint members of a panel charged with periodic evaluation of campaign statements, candor, and fairness. Those evaluations could be made public. And any number of private organizations or voter groups seeking to evaluate campaign rhetoric could do the same. See *White, supra,* at 795 (KENNEDY, J. concurring).

Modern communication technologies afford voters and

candidates an unparalleled opportunity to engage in the campaign and election process. These technologies may encourage a discourse that is principled and informed. The Internet, in particular, has increased in a dramatic way the rapidity and pervasiveness with which ideas may spread. Whether as a result of disclosure laws or a candidate's voluntary decision to make the campaign transparent, the Internet can reveal almost at once how a candidate sought funds; who the donors were; and what amounts they gave. Indeed, disclosure requirements offer a powerful, speech-enhancing method of deterring corruption—one that does not impose limits on how and when people can speak. See *Doe* v. *Reed*, 561 U. S. 186, 199 (2010) ("Public disclosure also promotes transparency and accountability in the electoral process to an extent other measures cannot"). Based on disclosures the voters can decide, among other matters, whether the public is well served by an elected judiciary; how each candidate defines appropriate campaign conduct (which may speak volumes about his or her judicial demeanor); and what persons and groups support or oppose a particular candidate. See *Buckley* v. *Valeo*, 424 U. S. 1, 67 (1976) (*per curiam*). With detailed information about a candidate's practices in soliciting funds, voters may be better informed in choosing those judges who are prepared to do justice "without fear or favor." 10 Encyclopaedia of the Laws of England 105 (2d ed. 1908). The speech the Court now holds foreclosed might itself have been instructive in this regard, and it could have been open to the electorate's scrutiny. Judicial elections, no less than other elections, presuppose faith in democracy. Judicial elections are no exception to the premise that elections can teach.

In addition to narrowing the First Amendment's reach, there is another flaw in the Court's analysis. That is its error in the application of strict scrutiny. The Court's evisceration of that judicial standard now risks long-term

harm to what was once the Court's own preferred First Amendment test. As JUSTICE SCALIA well explains, the state law at issue fails strict scrutiny for any number of reasons. The candidate who is not wealthy or well connected cannot ask even a close friend or relative for a bit of financial help, despite the lack of any increased risk of partiality and despite the fact that disclosure laws might be enacted to make the solicitation and support public. This law comes nowhere close to being narrowly tailored. And by saying that it survives that vital First Amendment requirement, the Court now writes what is literally a casebook guide to eviscerating strict scrutiny any time the Court encounters speech it dislikes. On these premises, and for the reasons explained in more detail by JUSTICE SCALIA, it is necessary for me to file this respectful dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1499

_____

## LANELL WILLIAMS-YULEE, PETITIONER *v.* THE FLORIDA BAR

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[April 29, 2015]

JUSTICE ALITO, dissenting.

I largely agree with what I view as the essential elements of the dissents filed by JUSTICES SCALIA and KENNEDY. The Florida rule before us regulates speech that is part of the process of selecting those who wield the power of the State. Such speech lies at the heart of the protection provided by the First Amendment. The Florida rule regulates that speech based on content and must therefore satisfy strict scrutiny. This means that it must be narrowly tailored to further a compelling state interest. Florida has a compelling interest in making sure that its courts decide cases impartially and in accordance with the law and that its citizens have no good reason to lack confidence that its courts are performing their proper role. But the Florida rule is not narrowly tailored to serve that interest.

Indeed, this rule is about as narrowly tailored as a burlap bag. It applies to all solicitations made in the name of a candidate for judicial office—including, as was the case here, a mass mailing. It even applies to an ad in a newspaper. It applies to requests for contributions in any amount, and it applies even if the person solicited is not a lawyer, has never had any interest at stake in any case in the court in question, and has no prospect of ever having any interest at stake in any litigation in that court.

If this rule can be characterized as narrowly tailored, then narrow tailoring has no meaning, and strict scrutiny, which is essential to the protection of free speech, is seriously impaired.

When petitioner sent out a form letter requesting campaign contributions, she was well within her First Amendment rights. The Florida Supreme Court violated the Constitution when it imposed a financial penalty and stained her record with a finding that she had engaged in unethical conduct. I would reverse the judgment of the Florida Supreme Court.