(Slip Opinion)          OCTOBER TERM, 2007                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NEW YORK STATE BOARD OF ELECTIONS ET AL. *v.* LOPEZ TORRES ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 06–766.   Argued October 3, 2007—Decided January 16, 2008

Under New York's current Constitution, State Supreme Court Justices
are elected in each of the State's judicial districts.  Since 1921, New
York's election law has required parties to select their nominees by a
convention composed of delegates elected by party members.  An in-
dividual running for delegate must submit a 500-signature petition
collected within a specified time.  The convention's nominees appear
automatically on the general-election ballot, along with any inde-
pendent candidates who meet certain statutory requirements.  Re-
spondents filed suit, seeking, *inter alia,* a declaration that New
York's convention system violates the First Amendment rights of
challengers running against candidates favored by party leaders and
an injunction mandating a direct primary election to select Supreme
Court nominees.  The Federal District Court issued a preliminary in-
junction, pending the enactment of a new state statutory scheme, and
the Second Circuit affirmed.

*Held:* New York's system of choosing party nominees for the State Su-
    preme Court does not violate the First Amendment.  Pp. 5–12.
    (a) Because a political party has a First Amendment right to limit
its membership as it wishes, and to choose a candidate-selection
process that will in its view produce the nominee who best represents
its political platform, a State's power to prescribe party use of prima-
ries or conventions to select nominees for the general election is not
without limits.  *California Democratic Party* v. *Jones*, 530 U. S. 567,
577.  However, respondents, who claim their own associational right
to join and have influence in the party, are in no position to rely on
the right that the First Amendment confers on political parties.
Pp. 5–7.

                       Syllabus

(b) Respondents' contention that New York's electoral system does not assure them a fair chance of prevailing in their parties' candidate-selection process finds no support in this Court's precedents. Even if *Kusper* v. *Pontikes*, 414 U. S. 51, 57, which acknowledged an individual's associational right to vote in a party primary without undue state-imposed impediment, were extended to cover the right to run in a party primary, the New York law's signature and deadline requirements are entirely reasonable. A State may demand a minimum degree of support for candidate access to a ballot, see *Jenness* v. *Fortson*, 403 U. S. 431, 442. P. 7.

(c) Respondents' real complaint is that the convention process following the delegate election does not give them a realistic chance to secure their party's nomination because the party leadership garners more votes for its delegate slate and effectively determines the nominees. This says no more than that the party leadership has more widespread support than a candidate not supported by the leadership. Cases invalidating ballot-access requirements have focused on the requirements themselves, and not on the manner in which political actors function under those requirements. *E.g., Bullock* v. *Carter*, 405 U. S. 134. Those cases do not establish an individual's constitutional right to have a "fair shot" at winning a party's nomination. Pp. 7–10.

(d) Respondents' argument that the existence of entrenched "one-party rule" in the State's general election demands that the First Amendment be used to impose additional competition in the parties' nominee-selection process is a novel and implausible reading of the First Amendment. Pp. 10–12.

462 F. 3d 161, reversed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, SOUTER, THOMAS, GINSBURG, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a concurring opinion, in which SOUTER, J., joined. KENNEDY, J., filed an opinion concurring in the judgment, in which BREYER, J., joined as to Part II.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–766

NEW YORK STATE BOARD OF ELECTIONS, ET AL., PETITIONERS *v.* MARGARITA LOPEZ TORRES ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[January 16, 2008]

JUSTICE SCALIA delivered the opinion of the Court.

The State of New York requires that political parties select their nominees for Supreme Court Justice at a convention of delegates chosen by party members in a primary election. We consider whether this electoral system violates the First Amendment rights of prospective party candidates.

## I

### A

The Supreme Court of New York is the State's trial court of general jurisdiction, with an Appellate Division that hears appeals from certain lower courts. See N. Y. Const., Art. VI, §§7, 8. Under New York's current Constitution, the State is divided into 12 judicial districts, see Art. VI, §6(a); N. Y. Jud. Law Ann. §140 (West 2005), and Supreme Court Justices are elected to 14-year terms in each such district, see N. Y. Const., Art. VI, §6(c). The New York Legislature has provided for the election of a total of 328 Supreme Court Justices in this fashion. See N. Y. Jud. Law Ann. §140–a (West Supp. 2007).

Over the years, New York has changed the method by which Supreme Court Justices are selected several times. Under the New York Constitution of 1821, Art. IV, §7, all judicial officers, except Justices of the Peace, were appointed by the Governor with the consent of the Senate. See 7 Sources and Documents of the U. S. Constitutions 181, 184 (W. Swindler ed. 1978). In 1846, New York amended its Constitution to require popular election of the Justices of the Supreme Court (and also the Judges of the New York Court of Appeals). *Id.*, at 192, 200 (N. Y. Const. of 1846, Art. VI, §12). In the early years under that regime, the State allowed political parties to choose their own method of selecting the judicial candidates who would bear their endorsements on the general-election ballot. See, *e.g.*, Report of Joint Committee of Senate and Assembly of New York, Appointed to Investigate Primary and Election Laws of This and Other States, S. Doc. No. 26, pp. 195–219 (1910). The major parties opted for party conventions, the same method then employed to nominate candidates for other state offices. *Ibid.;* see also P. Ray, An Introduction to Political Parties and Practical Politics 94 (1913).

In 1911, the New York Legislature enacted a law requiring political parties to select Supreme Court nominees (and most other nominees who did not run statewide) through direct primary elections. Act of Oct. 18, 1911, ch. 891, §45(4), 1911 N. Y. Laws 2657, 2682. The primary system came to be criticized as a "device capable of astute and successful manipulation by professionals," Editorial, The State Convention, N. Y. Times, May 1, 1917, p. 12, and the Republican candidate for Governor in 1920 campaigned against it as "a fraud" that "offered the opportunity for two things, for the demagogue and the man with money," Miller Declares Primary a Fraud, N. Y. Times, Oct. 23, 1920, p. 4. A law enacted in 1921 required parties to select their candidates for the Supreme Court by a

convention composed of delegates elected by party members. Act of May 2, 1921, ch. 479, §§45(1), 110, 1921 N. Y. Laws 1451, 1454, 1471.

New York retains this system of choosing party nominees for Supreme Court Justice to this day. Section 6–106 of New York's election law sets forth its basic operation: "Party nominations for the office of justice of the supreme court shall be made by the judicial district convention." N. Y. Elec. Law Ann. §6–106 (West 2007). A "party" is any political organization whose candidate for Governor received 50,000 or more votes in the most recent election. §1–104(3). In a September "delegate primary," party members elect delegates from each of New York's 150 assembly districts to attend the party's judicial convention for the judicial district in which the assembly district is located. See N. Y. State Law Ann. §121 (West 2003); N. Y. Elec. Law Ann. §§6–124, 8–100(1)(a) (West 2007). An individual may run for delegate by submitting to the Board of Elections a designating petition signed by 500 enrolled party members residing in the assembly district, or by five percent of such enrolled members, whichever is less. §§6–136(2)(i), (3). These signatures must be gathered within a 37-day period preceding the filing deadline, which is approximately two months before the delegate primary. §§6–134(4), 6–158(1). The delegates elected in these primaries are uncommitted; the primary ballot does not specify the judicial nominee whom they will support. §7–114.

The nominating conventions take place one to two weeks after the delegate primary. §§6–126, 6–158(5). Each of the 12 judicial districts has its own convention to nominate the party's Supreme Court candidate or candidates who will run at large in that district in the general election. §§6–124, 6–156. The general election takes place in November. §8–100(1)(c). The nominees from the party conventions appear automatically on the general-election

ballot. §7–104(5). They may be joined on the general-election ballot by independent candidates and candidates of political organizations that fail to meet the 50,000 vote threshold for "party" status; these candidates gain access to the ballot by submitting timely nominating petitions with (depending on the judicial district) 3,500 or 4,000 signatures from voters in that district or signatures from five percent of the number of votes cast for Governor in that district in the prior election, whichever is less. §§6–138, 6–142(2).

B

Respondent López Torres was elected in 1992 to the civil court for Kings County—a court with more limited jurisdiction than the Supreme Court—having gained the nomination of the Democratic Party through a primary election. She claims that soon after her election, party leaders began to demand that she make patronage hires, and that her consistent refusal to do so caused the local party to oppose her unsuccessful candidacy at the Supreme Court nominating conventions in 1997, 2002, and 2003. The following year, López Torres—together with other candidates who had failed to secure the nominations of their parties, voters who claimed to have supported those candidates, and the New York branch of a public-interest organization called Common Cause—brought suit in federal court against the New York Board of Elections, which is responsible for administering and enforcing the New York election law. See §§3–102, 3–104. They contended that New York's election law burdened the rights of challengers seeking to run against candidates favored by the party leadership, and deprived voters and candidates of their rights to gain access to the ballot and to associate in choosing their party's candidates. As relevant here, they sought a declaration that New York's convention system for selecting Supreme Court Justices violates

their First Amendment rights, and an injunction mandating the establishment of a direct primary election to select party nominees for Supreme Court Justice.

The District Court issued a preliminary injunction granting the relief requested, pending the New York Legislature's enactment of a new statutory scheme. 411 F. Supp. 2d 212, 256 (EDNY 2006). A unanimous panel of the United States Court of Appeals for the Second Circuit affirmed. 462 F. 3d 161 (2006). It held that voters and candidates possess a First Amendment right to a "realistic opportunity to participate in [a political party's] nominating process, and to do so free from burdens that are both severe and unnecessary." *Id.*, at 187. New York's electoral law violated that right because of the quantity of signatures and delegate recruits required to obtain a Supreme Court nomination at a judicial convention, see *id.*, at 197, and because of the apparent reality that party leaders can control delegates, see *id.*, at 198–200. In the court's view, because "one-party rule" prevailed within New York's judicial districts, a candidate had a constitutional right to gain access to the party's convention, notwithstanding her ability to get on the general-election ballot by petition signatures. *Id.*, at 193–195, 200. The Second Circuit's holding effectively returned New York to the system of electing Supreme Court Justices that existed before the 1921 amendments to the election law. We granted certiorari. 549 U. S. \_\_\_ (2007).

## II

### A

A political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform. *Democratic Party of United States* v. *Wisconsin ex rel. La Follette*, 450 U. S. 107, 122 (1981); *California Democratic Party* v.

*Jones*, 530 U. S. 567, 574–575 (2000). These rights are circumscribed, however, when the State gives the party a role in the election process—as New York has done here by giving certain parties the right to have their candidates appear with party endorsement on the general-election ballot. Then, for example, the party's racially discriminatory action may become state action that violates the Fifteenth Amendment. See *id.*, at 573. And then also the State acquires a legitimate governmental interest in assuring the fairness of the party's nominating process, enabling it to prescribe what that process must be. *Id.*, at 572–573. We have, for example, considered it to be "too plain for argument" that a State may prescribe party use of primaries or conventions to select nominees who appear on the general-election ballot. *American Party of Tex.* v. *White*, 415 U. S. 767, 781 (1974). That prescriptive power is not without limits. In *Jones*, for example, we invalidated on First Amendment grounds California's blanket primary, reasoning that it permitted non-party members to determine the candidate bearing the party's standard in the general election. 530 U. S., at 577. See also *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 224 (1989); *Tashjian* v. *Republican Party of Conn.*, 479 U. S. 208, 214–217 (1986).

In the present case, however, the party's associational rights are at issue (if at all) only as a shield and not as a sword. Respondents are in no position to rely on the right that the First Amendment confers on political parties to structure their internal party processes and to select the candidate of the party's choosing. Indeed, both the Republican and Democratic state parties have intervened from the very early stages of this litigation to defend New York's electoral law. The weapon wielded by these plaintiffs is their *own* claimed associational right not only to join, but to have a certain degree of influence in, the party. They contend that New York's electoral system does not go

far enough—does not go as far as the Constitution de-
mands—in assuring that they will have a fair chance of
prevailing in their parties' candidate-selection process.

This contention finds no support in our precedents. We
have indeed acknowledged an individual's associational
right to vote in a party primary without undue state-
imposed impediment. In *Kusper* v. *Pontikes*, 414 U. S. 51,
57 (1973), we invalidated an Illinois law that required a
voter wishing to change his party registration so as to vote
in the primary of a different party to do so almost two full
years before the primary date. But *Kusper* does not cast
doubt on all state-imposed limitations upon primary vot-
ing. In *Rosario* v. *Rockefeller,* 410 U. S. 752 (1973), we
upheld a New York State requirement that a voter have
enrolled in the party of his choice at least 30 days before
the previous general election in order to vote in the next
party primary. In any event, respondents do not claim
that they have been excluded from voting in the primary.
Moreover, even if we extended *Kusper* to cover not only the
right to vote in the party primary but also the right to run,
the requirements of the New York law (a 500-signature
petition collected during a 37-day window in advance of
the primary) are entirely reasonable. Just as States may
require persons to demonstrate "a significant modicum of
support" before allowing them access to the general-
election ballot, lest it become unmanageable, *Jenness* v.
*Fortson*, 403 U. S. 431, 442 (1971), they may similarly
demand a minimum degree of support for candidate access
to a primary ballot. The signature requirement here is far
from excessive. See, *e.g.*, *Norman* v. *Reed*, 502 U. S. 279,
295 (1992) (approving requirement of 25,000 signatures,
or approximately two percent of the electorate); *White*,
*supra*, at 783 (approving requirement of one percent of the
vote cast for Governor in the preceding general election,
which was about 22,000 signatures).

Respondents' real complaint is not that they cannot vote

in the election for delegates, nor even that they cannot run in that election, but that the convention process that follows the delegate election does not give them a realistic chance to secure the party's nomination. The party leadership, they say, inevitably garners more votes for its slate of delegates (delegates uncommitted to any judicial nominee) than the unsupported candidate can amass for himself. And thus the leadership effectively determines the nominees. But this says nothing more than that the party leadership has more widespread support than a candidate not supported by the leadership. No New York law compels election of the leadership's slate—or, for that matter, compels the delegates elected on the leadership's slate to vote the way the leadership desires. And no state law prohibits an unsupported candidate from attending the convention and seeking to persuade the delegates to support her. Our cases invalidating ballot-access requirements have focused on the requirements themselves, and not on the manner in which political actors function under those requirements. See, *e.g.*, *Bullock* v. *Carter*, 405 U. S. 134 (1972) (Texas statute required exorbitant filing fees); *Williams* v. *Rhodes*, 393 U. S. 23 (1968) (Ohio statute required, *inter alia*, excessive number of petition signatures); *Anderson* v. *Celebrezze*, 460 U. S. 780 (1983) (Ohio statute established unreasonably early filing deadline). Here respondents complain not of the state law, but of the voters' (and their elected delegates') preference for the choices of the party leadership.

To be sure, we have, as described above, permitted States to set their faces against "party bosses" by requiring party-candidate selection through processes more favorable to insurgents, such as primaries. But to say that the State can require this is a far cry from saying that the Constitution demands it. None of our cases establishes an individual's constitutional right to have a "fair shot" at winning the party's nomination. And with good reason.

What constitutes a "fair shot" is a reasonable enough question for legislative judgment, which we will accept so long as it does not too much infringe upon the party's associational rights. But it is hardly a manageable constitutional question for judges—especially for judges in our legal system, where traditional electoral practice gives no hint of even the existence, much less the content, of a constitutional requirement for a "fair shot" at party nomination. Party conventions, with their attendant "smoke-filled rooms" and domination by party leaders, have long been an accepted manner of selecting party candidates. "National party conventions prior to 1972 were generally under the control of state party leaders" who determined the votes of state delegates. American Presidential Elections: Process, Policy, and Political Change 14 (H. Schantz ed. 1996). Selection by convention has never been thought unconstitutional, even when the delegates were not selected by primary but by party caucuses. See *ibid.*

The Second Circuit's judgment finesses the difficulty of saying how much of a shot is a "fair shot" by simply mandating a primary until the New York Legislature acts. This was, according to the Second Circuit, the New York election law's default manner of party-candidate selection for offices whose manner of selection is not otherwise prescribed. Petitioners question the propriety of this mandate, but we need not pass upon that here. Even conceding its propriety, there is good reason to believe that the elected members of the New York Legislature remain opposed to the primary, for the same reasons their predecessors abolished it 86 years ago: because it leaves judicial selection to voters uninformed about judicial qualifications, and places a high premium upon the ability to raise money. Should the New York Legislature persist in that view, and adopt something different from a primary and closer to the system that the Second Circuit invalidated, the question whether *that* provides enough of a "fair shot"

would be presented.  We are not inclined to open up this new and excitingly unpredictable theater of election jurisprudence.  Selection by convention has been a traditional means of choosing party nominees.  While a State may determine it is not desirable and replace it, it is not unconstitutional.

B

Respondents put forward, as a special factor which gives them a First Amendment right to revision of party processes in the present case, the assertion that party loyalty in New York's judicial districts renders the general-election ballot "uncompetitive."  They argue that the existence of entrenched "one-party rule" demands that the First Amendment be used to impose additional competition in the nominee-selection process of the parties.  (The asserted "one-party rule," we may observe, is that of the Democrats in some judicial districts, and of the Republicans in others.  See 411 F. Supp. 2d, at 230.)  This is a novel and implausible reading of the First Amendment.

To begin with, it is hard to understand how the competitiveness of the general election has anything to do with respondents' associational rights in the party's selection process.  It makes no difference to the person who associates with a party and seeks its nomination whether the party is a contender in the general election, an underdog, or the favorite.  Competitiveness may be of interest to the voters in the general election, and to the candidates who choose to run *against* the dominant party.  But we have held that those interests are well enough protected so long as all candidates have an adequate opportunity to appear on the general-election ballot.  In *Jenness* we upheld a petition-signature requirement for inclusion on the general-election ballot of five percent of the eligible voters, see 403 U. S., at 442, and in *Munro* v. *Socialist Workers Party*, 479 U. S. 189, 199 (1986), we upheld a petition-signature

requirement of one percent of the vote in the State's primary. New York's general-election balloting procedures for Supreme Court Justice easily pass muster under this standard. Candidates who fail to obtain a major party's nomination via convention can still get on the general-election ballot for the judicial district by providing the requisite number of signatures of voters resident in the district. N. Y. Elec. Law Ann. §6–142(2). To our knowledge, outside of the Fourteenth and Fifteenth Amendment contexts, see *Jones*, 530 U. S., at 573, no court has ever made "one-party entrenchment" a basis for interfering with the candidate-selection processes of a party. (Of course, the *lack* of one-party entrenchment will not cause free access to the general-election ballot to validate an otherwise unconstitutional restriction upon participation in a party's nominating process. See *Bullock*, 405 U. S., at 146–147.)

The reason one-party rule is entrenched may be (and usually is) that voters approve of the positions and candidates that the party regularly puts forward. It is no function of the First Amendment to require revision of those positions or candidates. The States can, within limits (that is, short of violating the parties' freedom of association), discourage party monopoly—for example, by refusing to show party endorsement on the election ballot. But the Constitution provides no authority for federal courts to prescribe such a course. The First Amendment creates an open marketplace where ideas, most especially political ideas, may compete without government interference. See *Abrams* v. *United States*, 250 U. S. 616, 630 (1919) (Holmes, J., dissenting). It does not call on the federal courts to manage the market by preventing too many buyers from settling upon a single product.

Limiting respondents' court-mandated "fair shot at party endorsement" to situations of one-party entrenchment merely multiplies the impracticable lines courts

would be called upon to draw.  It would add to those al-
luded to earlier the line at which mere party popularity
turns into "one-party dominance."   In the case of New
York's election system for Supreme Court Justices, that
line would have to be drawn separately for each of the 12
judicial districts—and in those districts that are "competi-
tive" the current system would presumably remain valid.
But why limit the remedy to *one*-party dominance?  Does
not the dominance of two parties similarly stifle competing
opinions?  Once again, we decline to enter the morass.

                    *    *    *

   New York State has thrice (in 1846, 1911, and 1921)
displayed a willingness to reconsider its method of select-
ing Supreme Court Justices.  If it wishes to return to the
primary system that it discarded in 1921, it is free to do
so; but the First Amendment does not compel that.  We
reverse the Second Circuit's contrary judgment.

                                        *It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

───────────

No. 06–766

───────────

## NEW YORK STATE BOARD OF ELECTIONS, ET AL., PETITIONERS *v.* MARGARITA LOPEZ TORRES ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[January 16, 2008]

JUSTICE STEVENS, with whom JUSTICE SOUTER joins, concurring.

While I join JUSTICE SCALIA'S cogent resolution of the constitutional issues raised by this case, I think it appropriate to emphasize the distinction between constitutionality and wise policy. Our holding with respect to the former should not be misread as endorsement of the electoral system under review, or disagreement with the findings of the District Court that describe glaring deficiencies in that system and even lend support to the broader proposition that the very practice of electing judges is unwise. But as I recall my esteemed former colleague, Thurgood Marshall, remarking on numerous occasions: "The Constitution does not prohibit legislatures from enacting stupid laws."

# SUPREME COURT OF THE UNITED STATES

───────────

No. 06–766

───────────

## NEW YORK STATE BOARD OF ELECTIONS, ET AL., PETITIONERS *v.* MARGARITA LOPEZ TORRES ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[January 16, 2008]

JUSTICE KENNEDY, with whom JUSTICE BREYER joins as to Part II, concurring in the judgment.

The Court's analysis, in my view, is correct in important respects; but my own understanding of the controlling principles counsels concurrence in the judgment and the expression of these additional observations.

## I

When a state-mandated primary is used to select delegates to conventions or nominees for office, the State is bound not to design its ballot or election processes in ways that impose severe burdens on First Amendment rights of expression and political participation. See *Kusper* v. *Pontikes*, 414 U. S. 51, 57–58 (1973); see also *California Democratic Party* v. *Jones*, 530 U. S. 567, 581–582 (2000); cf. *Lubin* v. *Panish*, 415 U. S. 709, 716 (1974); *Bullock* v. *Carter*, 405 U. S. 134, 144 (1972); *Gray* v. *Sanders*, 372 U. S. 368, 380 (1963). Respondents' objection to New York's scheme of nomination by convention is that it is difficult for those who lack party connections or party backing to be chosen as a delegate or to become a nominee for office. Were the state-mandated-and-designed nominating convention the sole means to attain access to the general election ballot there would be considerable force,

in my view, to respondents' contention that the First
Amendment prohibits the State from requiring a delegate
selection mechanism with the rigidities and difficulties
attendant upon this one.  The system then would be sub-
ject to scrutiny from the standpoint of a "reasonably dili-
gent independent candidate," *Storer* v. *Brown*, 415 U. S.
724, 742 (1974).  The Second Circuit took this approach.
462 F. 3d 161, 196 (2006).

   As the Court is careful to note, however, New York has a
second mechanism for placement on the final election
ballot.  *Ante*, at 4.  One who seeks to be a Justice of the
New York Supreme Court may qualify by a petition proc-
ess.  The petition must be signed by the lesser of (1) 5
percent of the number of votes last cast for Governor in
the judicial district or (2) either 3,500 or 4,000 voters
(depending on the district).  This requirement has not
been shown to be an unreasonable one, a point respon-
dents appear to concede.  True, the candidate who gains
ballot access by petition does not have a party designation;
but the candidate is still considered by the voters.

   The petition alternative changes the analysis.   Cf.
*Munro* v. *Socialist Workers Party*, 479 U. S. 189, 199
(1986) ("It can hardly be said that Washington's voters are
denied freedom of association because they must channel
their expressive activity into a campaign at the primary as
opposed to the general election").

   This is not to say an alternative route to the general
election exempts the delegate primary/nominating conven-
tion from all scrutiny.  For instance, the Court in *Bullock*,
after determining that Texas' primary election filing fees
were so "patently exclusionary" on the basis of wealth as
to invoke strict scrutiny under the Equal Protection
Clause, rejected the argument that candidate access to the
general election without a fee saved the statute.  405 U. S.,
at 143–144, 146–147 ("[W]e can hardly accept as reason-
able an alternative that requires candidates and voters to

abandon their party affiliations in order to avoid the bur-
dens of the filing fees"). But there is a dynamic relation-
ship between, in this case, the convention system and the
petition process; higher burdens at one stage are mitigated
by lower burdens at the other. See *Burdick* v. *Takushi*,
504 U. S. 428, 448 (1992) (KENNEDY, J., dissenting) ("The
liberality of a State's ballot access laws is one determinant
of the extent of the burden imposed by the write-in ban; it
is not, though, an automatic excuse for forbidding all
write-in voting"); Persily, Candidates v. Parties: Constitu-
tional Constraints on Primary Ballot Access Laws, 89 Geo.
L. J. 2181, 2214–2216 (2001). And, though the point does
not apply here, there are certain injuries (as in *Bullock*)
that are so severe they are unconstitutional no matter how
minor the burdens at the other stage. As the Court recog-
nized in *Kusper*, moreover, there is an individual right to
associate with the political party of one's choice and to
have a voice in the selection of that party's candidate for
public office. See 414 U. S., at 58. On the particular facts
and circumstances of this case, then, I reach the same
conclusion the Court does.

II

It is understandable that the Court refrains from com-
menting upon the use of elections to select the judges of
the State's courts of general jurisdiction, for New York has
the authority to make that decision. This closing observa-
tion, however, seems to be in order.

When one considers that elections require candidates to
conduct campaigns and to raise funds in a system de-
signed to allow for competition among interest groups and
political parties, the persisting question is whether that
process is consistent with the perception and the reality of
judicial independence and judicial excellence. The rule of
law, which is a foundation of freedom, presupposes a
functioning judiciary respected for its independence, its

professional attainments, and the absolute probity of its judges. And it may seem difficult to reconcile these aspirations with elections.

Still, though the Framers did not provide for elections of federal judges, most States have made the opposite choice, at least to some extent. In light of this longstanding practice and tradition in the States, the appropriate practical response is not to reject judicial elections outright but to find ways to use elections to select judges with the highest qualifications. A judicial election system presents the opportunity, indeed the civic obligation, for voters and the community as a whole to become engaged in the legal process. Judicial elections, if fair and open, could be an essential forum for society to discuss and define the attributes of judicial excellence and to find ways to discern those qualities in the candidates. The organized bar, the legal academy, public advocacy groups, a principled press, and all the other components of functioning democracy must engage in this process.

Even in flawed election systems there emerge brave and honorable judges who exemplify the law's ideals. But it is unfair to them and to the concept of judicial independence if the State is indifferent to a selection process open to manipulation, criticism, and serious abuse.

Rule of law is secured only by the principled exercise of political will. If New York statutes for nominating and electing judges do not produce both the perception and the reality of a system committed to the highest ideals of the law, they ought to be changed and to be changed now. But, as the Court today holds, and for further reasons given in this separate opinion, the present suit does not permit us to invoke the Constitution in order to intervene.

### III

With these observations, I concur in the judgment of the Court.