BERZON, Circuit Judge,
concurring:
Given Williams-Yulee v. Florida Bar, — U.S. -, 135 S.Ct. 1656, 191 L.Ed.2d 570 (2015), I am in general agreement with Judge Gould’s opinion for the en banc court (“main opinion”). There are two points, however, as to which the main opinion is terse, at best, and which therefore, in my view, deserve further exploration.
First, I concurred in the panel opinion to highlight my concern about articulating the governmental interests at stake in regulating judicial elections, and write separately here, too, to reiterate the same concern. Wolf son v. Concannon, 750 F.3d 1145, 1160 (9th Cir.2014) (Berzon, J., concurring). The main opinion supports all three of Arizona’s challenged restrictions on judicial candidates’ behavior during judicial election campaigns on the basis of the same governmental interest — judicial impartiality. See, e.g., Maj. Op. at 1183-84. But three different species of speech regulation of judicial candidates are here at issue, not one. And while one of the regulations — the ban on personal solicitation — is closely related to the restriction considered in Williams-Yulee, two — the bans on endorsements and campaigning for nonjudicial candidates and causes — are quite different. As to the latter two bans, I am not at all sure that the governmental interest in preventing biased judicial deci- *1187 sionmaking survives the compelling interest/narrowly tailored standard we are required to apply. I am convinced, however, that there is a societal interest underlying those two restrictions — maintaining an independent judiciary — that more accurately captures the reasons to limit judicial candidates’ endorsements and campaigning activity, and that does meet the compelling interest/narrow tailoring requirements.
Additionally, the main opinion does not distinguish between sitting judges who run for judicial office and judicial candidates who are not yet, and may never be, judges. This distinction turns out not to be disposi-tive of this case, but it is worth explaining why that is so.
1. As the main opinion and the Supreme Court recognize, “[t]he concept of public confidence in judicial integrity does not easily reduce to precise definition.” Williams-Yulee v. Florida Bar, — U.S. -, 135 S.Ct. 1656, 1667, 191 L.Ed.2d 570 (2015). In my view, this case requires us to disentangle two distinct facets of this compelling interest.
First, society has an interest in judicial impartiality that is “both weighty and narrow.” Wolfson, 750 F.3d at 1163 (Berzon, J., concurring). This fundamental interest is enshrined in the Due Process Clause’s prohibition on a judge trying a case in which she “has an interest in the outcome.” Caperton v. AT. Massey Coal Co., Inc., 556 U.S. 868, 880, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009).
It is this impartiality concern that underlay the solicitation restriction in Williams-Yulee and also undergirds Arizona’s ban on judges’ personal solicitation of funds. “[M]ost donors are lawyers and litigants who may appear before the judge they are supporting,” Williams-Yulee, 135 S.Ct. at 1667, and “personal solicitation by a judicial candidate ‘inevitably places the solicited individuals in a position to fear retaliation if they fail to financially support that candidate,’ ” id. at 1668 (quoting Simes v. Ark. Judicial Discipline and Disability Com’n, 368 Ark. 577, 585, 247 S.W.3d 876 (2007)). This impartiality interest is important; its reach is also fairly limited. Impartiality’s “root meaning” refers to the lack of “bias for or against either party to the proceeding.” Republican Party of Minn. v. White, 536 U.S. 765, 775, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (emphasis in original). Restrictions that can be justified by society’s interest in impartiality are those that aim at protecting the due process rights of litigants appearing before a judge in court.
There is, however, a separate, broader governmental basis for regulating judicial behavior that goes beyond a concern with biased decisionmaking in individual cases. That interest is society’s concern with maintaining both the appearance and the reality of a structurally independent judiciary, engaged in a decisionmaking process informed by legal, not political or broad, nonlegal policy considerations. As I explained in my concurrence to the panel opinion,
Maintaining public trust in the judiciary as an institution driven by legal principles rather than political concerns is a structural imperative. The rule of law depends upon it.
The fundamental importance of this structural imperative has been recognized from the founding of the nation. As Alexander Hamilton emphasized in The Federalist No. 78, the courts possess “neither FORCE nor WILL, but merely judgment....” Id. at 433 (Clinton Rossiter ed., 1961). Deprived of those alternative sources of power, the authority of the judiciary instead “lies ... in its legitimacy, a product of substance and perception that shows itself in the people’s acceptance of the Judiciary as fit to determine what the ... *1188 law means and to declare what it demands.” Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 865, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); see also White, 536 U.S. at 793, 122 S.Ct. 2528 (Kennedy, J., concurring) (“The power and the prerogative of a court ... rest, in the end, upon the respect accorded to its judgments.”). It is the courts’ perceived legitimacy as institutions grounded in established legal principles, not partisanship, “that leads decisions to be obeyed and averts vigilantism and civil strife.” Bauer, 620 F.3d at 712. Loss of judicial legitimacy thus corrodes the rule of law, “sap[ping] the foundations of public and private confidence, and ... introducing] in its stead universal distrust and distress.” The Federalist No. 78, at 438. In this sense, “[t]he rule of law, which is a foundation of freedom, presupposes a functioning judiciary respected for its independence, its professional attainments, and the absolute probity of its judges.” NY State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 212, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008) (Kennedy, J., concurring).
This nation’s political history demonstrates the disastrous effects of the perceived politicization of the courts. Charges that King George “ha[d] obstructed the Administration of Justice” and “ha[d] made judges dependent on his Will alone----” were among the founding generation’s justifications for the 1776 revolution. The Declaration of Independence para. 11 (U.S.1776). Similar concerns apply outside the context of a monarchy: Where the judiciary is drawn into the political intrigues of its coordinate branches, the public might well “fear that the péstilential breath of faction may poison the fountains of justice. The habit of being continually marshaled on opposite sides will be too apt to stifle the voice both of law and of equity.” The Federalist No. 81, at 452 (Alexander Hamilton) (Clinton Rossiter ed., 1961). And where the politicization of the judiciary brings it into alliance with the politicians who staff the other two branches of government, the public may no longer consider “the courts of justice ... as the bulwark of a limited Constitution against legislative encroachments,” The Federalist No. 78, at 437, or executive excesses. In short, when sitting judges support the campaigns of nonjudicial candidates — via endorsements, speeches, money, or other means — the public may begin to see them not as neutral arbiters of a limited system of governance, but as participants in the larger game of politics.
Wolfson, 750 F.3d at 1164-65 (Berzon, J. concurring) (footnotes omitted).
In short, a deep-seated interest in the structural independence of the judiciary has been recognized as indispensable to our constitutional order since the founding era. See id. at 1164. An independent judge “must above all things put aside his estimate of political and legislative values” when interpreting the law. Benjamin Cardozo, The Nature of the Judicial Process, 90 (1921) (internal quotation mark omitted) (quoting Lorenz Brütt, Die Kunst der Rechtsanwendung, 57 (1907)).
When judges swap endorsements with legislative or executive candidates, or make speeches during nonjudicial political campaigns, their political and legislative values are brought to the fore, threatening the public’s perception of their independence. To quote again from my panel concurrence:
The defendants here express precisely this concern — that if sitting judges may support the campaigns of others, the public will perceive them as masters of the political game, powerbrokers “trading on the prestige of their office to *1189 advance other political ends.... ” Sie-fert, 608 F.3d at 984; see also Model Code of Judicial Conduct R. 4.1, cmt.4 (2011) (justifying prohibitions on endorsements and speeches on behalf of other candidates as “preventing sitting judges] from abusing the prestige of judicial office to advance the interests of others”). The opposite fear is equally justified: Today’s powerbroker is tomorrow’s pawn, as the political winds shift and the next election cycle approaches. The endorsing judge entwines his fate with whomever he endorses and earns the enmity of his favored politician’s opponents. “This kind of personal affiliation between a member of the judiciary and a member of the political branches raises the specter — readily perceived by the general public — that the judge’s future rulings will be influenced by this political dependency.” Wersal v. Sexton, 674 F.3d 1010, 1034 (8th Cir.2012) (Loken, J., concurring in the judgment) (emphasis in original).
Wolfson, 750 F.3d at 1165 (Berzon, J., concurring).
I read neither Williams-Yulee nor the main opinion to say anything to the contrary. Both impartiality and independence are implicit, for instance, in the majority’s reference to “the judiciary’s ability to abide by the law and not make decisions along political lines.” Maj. Op. at 1184. But because First Amendment doctrine focuses on the breadth and nature of the interests at stake, it is important to be clear that the interests raised by this case are not limited to the due process concerns signaled by the term judicial impartiality.
This dual focus is particularly critical where, as in this case, the two interests affect aspects of the regulations at issue differently. The main opinion takes Williams-Yulee’s reasoning regarding the personal solicitation of funds and applies it to uphold a ban on judicial candidates endorsing or campaigning for nonjudicial political candidates and organizations. But the concerns raised by these distinct activities only partially overlap. An in-person solicitation creates a unique risk of a quid pro quo arrangement, or at least the appearance of one, between a judicial candidate and a donor. See Wersal v. Sexton, 674 F.3d 1010, 1029 (8th Cir.2012) (en banc). The risk of such an arrangement is more attenuated, though, when it comes to endorsements and campaigning for nonjudicial candidates and issues. Candidates can, of course, exchange endorsements in a mutually beneficial arrangement. But there may be many scenarios where “[a] judicial candidate’s endorsement of an executive or legislative candidate ... benefits the endorsee more than the endorser.” Id. at 1049 (Beam, J., dissenting). The same can be true when a judicial candidate lends their time or credibility to a nonjudicial issue campaign.
Reframing the governmental interest underlying restrictions on judicial candidates’ role in campaigns or political organizations other than their own also brings better into focus the requisite “less-restrictive means” analysis. Personal recusal is an ineffective alternative to the solicitation bar because, as Williams-Yulee and the majority point out, it would be problematic to have many recusals in smaller jurisdictions, and individuals would have a “perverse incentive” to donate to judges in the hopes of forcing the judge to recuse if elected. Williams-Yulee, 135 S.Ct. at 1671-72; Maj. Op. at 1182. In contrast, recusals might be a better alternative to the endorsement and campaign bars, if the only concern were avoiding conflicts of interest. The number of nonjudicial endorsements or campaign speeches a candidate makes is likely to be far lower than the number of individuals donating to his or her campaign. And the concern of hostile donations as “a form of peremptory strike against a judge,” Williams-Yulee, *1190 135 S.Ct. at 1672, disappears where the judicial candidate is the one choosing whom to endorse.
It is not clear to me, then, that the compelling interest of judicial impartiality, or the reasons for concluding that the restrictions are sufficiently narrowly focused, translate well from the solicitation realm to the practice of campaigning for or endorsing other candidates or issues. But these restrictions surely do advance the vital interest in structural judicial independence. The campaign and endorsement restrictions respond to a structural need— they restrict judges from engaging in nonjudicial campaigns, to prevent them from being entangled in the legislative and executive political process. Judges must have the confidence to stand firm against nonju-dieial elected officials. That confidence could give way — or appear to give way — if judges behave just like those elected officials, by engaging in the usual, often contentious and fiercely partisan, political processes.
2. I also write to note another distinction that both the main opinion and Williams-Yulee elide. Both opinions lump together sitting judges running for re-election and nonjudge candidates aspiring to the office. See, e.g., Williams-Yulee, 135 S.Ct. at 1668; Maj. Op. at 1183. The main opinion does so not only with respect to the restriction directly pertinent to the judicial election, the solicitation restriction, but with respect to the two other restrictions as well.
It is worth considering whether that uniform treatment is justified. On reflection, it seems to me that competing considerations pull in various directions with regard to the application to sitting judges and judicial candidates of the nonjudicial endorsement and campaigning restrictions. In the end, I agree with the main opinion’s conclusion that all three regulations at issue are valid with respect to both groups.
First, sitting judges are already public employees. The Supreme Court has held in the Pickering line of cases that public employee speech may be subject to greater restrictions than the First Amendment would otherwise allow. See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cwty., Ill, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The Seventh Circuit, for instance, has applied Pickering to adopt a balancing test when evaluating restrictions on sitting judges’ speech. See Bauer v. Shepard, 620 F.3d 704 (7th Cir. 2010); Siefert v. Alexander, 608 F.3d 974 (7th Cir.2010). But Pickering does not appear to apply to the speech of candidates for judicial office who are not yet public employees.
Second, the structural judicial independence interest that to me is central to upholding two of the three judicial campaign restrictions here applicable comes into full force only when the individual elected actually ascends the bench. Before that, the concern is somewhat contingent — the candidate may become a judge. Still, that contingency may be sufficient reason for treating a judicial candidate who is not a sitting judge according to the rules of judicial ethics. The structural independence concerns are largely aspirational, and the public perception of the judicial role may be most at the forefront during judicial elections. So drawing the line on nonjudicial political participation at the point of declaration of judicial candidacy may help to forward both the reality and the appearance of a politically independent judiciary.
Moreover, if sitting judges were subject to greater restrictions on political activity than nonjudge candidates, two individuals may end up running for the same judicial office on somewhat uneven footing. The Supreme Court has “repeatedly rejected the argument that the government has a *1191 compelling state interest in ‘leveling the playing field’ that can justify undue burdens on political speech.” Ariz. Free Enterprise Club’s Freedom Club PAC v. Bennett, 564 U.S. 721, 131 S.Ct. 2806, 2825, 180 L.Ed.2d 664 (2011). But those cases have concerned attempts at government intervention designed to adjust for nongovernmental disparities. Here, stricter restrictions during judicial campaigns on nonjudicial endorsement and campaigning for sitting judges than for nonincumbent candidates for judicial positions would create the disparity, not level it. Such political participation gives judicial candidates more opportunity for exposure to the electorate, and more chance to connect with voters on nonjudicial matters they care about. The inequity of allowing some candidates for judicial office but not others those opportunities, when added to the aspirational and appearance concerns just discussed, seem sufficiently compelling to justify parallel restrictions for sitting judges and nonjudges, when both are running for the same judicial office.
In sum, I concur in the main opinion, in light of the further conclusions I reach in this concurrence.