[J-83-2016] [MO: Todd, J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| LAWRENCE S. SHOUL, | : | No. 64 MAP 2015 |
| | : | |
| Appellee | : | Appeal from the Order of the Adams |
| | : | County Court of Common Pleas, Civil |
| | : | Division, at No. 2014-S-721 dated |
| v. | : | February 24, 2015, exited February 26, |
| | : | 2015. |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | ARGUED:  December 6, 2016 |
| DEPARTMENT OF TRANSPORTATION, | : | |
| BUREAU OF DRIVER LICENSING, | : | |
| | : | |
| Appellant | : | |

**CONCURRING OPINION**

**JUSTICE WECHT**                    **DECIDED:  November 22, 2017**

I join in full the learned Majority's analysis of Shoul's cruel and unusual punishment challenge.  I concur in the result reached by the Majority in its rejection of Shoul's substantive due process challenge.  However, I disagree respectfully with the Majority's analysis of substantive due process under the Constitution of the Commonwealth of Pennsylvania.

The Majority correctly employs a rational basis test in evaluating Shoul's due process claim, reaffirming that a commercial driver's license is a privilege and not a fundamental right.  *Plowman v. Pa. Dep't of Transp., Bureau of Driver Licensing*, 635 A.2d 124, 126 (Pa. 1993) ("Since a driver's license is a privilege and not a fundamental right, legislation affecting it must be evaluated under a 'rational basis' analysis.").[1]

---

[1]    It is well-established that driving is merely a privilege subject to reasonable regulation by the state.  *See Plowman v. Com., Dep't of Transp., Bureau of Driver* (continued…)

Moreover, even if we accept Shoul's argument that the revocation of his commercial license impacts his right to choose his profession, "the right to practice a chosen profession is subject to the lawful exercise of the power of the State to protect the public health, safety, welfare, and morals by promulgating laws and regulations that reasonably regulate occupations." *Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946 (Pa. 2004). Accordingly, the rational basis test undoubtedly applies.

However, that test, as it has developed in Pennsylvania, is amorphous and subject to inconsistent application. The problem stems from this Court's continued reliance upon *Gambone v. Commonwealth*, 101 A.2d 634 (Pa. 1954). The language from *Gambone* that is jurisprudentially problematic reads as follows:

> By a host of authorities, . . . Federal and State alike, it has been held that a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the

(…continued)

*Licensing*, 635 A.2d 124, 126 (Pa. 1993) ("Operating a motor vehicle upon a Commonwealth highway is not a property right but a 'privilege.' As such, the Commonwealth has the right to control and regulate its use. However, such regulation must be tempered by adherence to the precepts of due process of law.") (citations omitted); *Commonwealth v. Funk*, 186 A. 65, 67-68 (Pa. 1936) ("The permission to operate a motor vehicle upon the highways of the [C]ommonwealth is not embraced within the term civil rights . . . . Although the privilege may be a valuable one, it is no more than a permit granted by the state, its enjoyment depending upon compliance with the conditions prescribed by it, and subject always to such regulation and control as the state may see fit to impose."); *accord Hess v. Pawloski*, 274 U.S. 352, 356 (1927) ("In the public interest the state may make and enforce regulations reasonabl[y] calculated to promote care on the part of all, residents and nonresidents alike, who use its highways.").

first instance, of the law-making branch of the government, but its final determination is for the courts.

*Gambone*, 101 A.2d at 636-37 (footnotes omitted).[2]

And so was planted the notion that we judges are to weigh the "reasonableness" of statutes. This was more than a little bit of *Lochner*-izing.[3] And yet, *Gambone* continues to receive uncritical citation, and so, the precedent creeps on.

True it is that *Gambone* was decided in 1954, a time when the constitutional standards for analyzing due process claims still were being formed. *See generally* David E. Bernstein, *Lochner v. New York: A Centennial Retrospective*, 83 Wash. U. L.Q. 1469 (2005) (discussing the historical impact of *Lochner* on due process jurisprudence). *Lochner* and cases of its genre were decided in an era during which the Supreme Court of the United States, under the guise of protecting economic rights, actively struck down state laws because it disagreed with the economic theory or opinion of the legislatures that passed those statutes. *See Sorrell v. IMS Health Inc.*,

---

[2]    In *Gambone*, this Court reviewed a state and federal due process challenge to a Pennsylvania statute that prohibited display of price signs in measuring in excess of twelve square inches at or adjacent to gasoline stations.

[3]    *See Lochner v. New York*, 198 U.S. 45 (1905). The language of *Gambone* mirrors that of earlier United States Supreme Court decisions from what has been deemed the "*Lochner* era." *See, e.g., Adair v. United States*, 208 U.S. 161, 178 (1908) ("[A]ny rule prescribed for the conduct of interstate commerce, in order to be within the competency of Congress under its power to regulate commerce among the states, must have some *real or substantial relation* to or connection with the commerce regulated.") (emphasis added); C*hicago, B. & Q. Ry. Co. v. Ilinois*, 200 U.S. 561, 593 (1906) ("If the means employed have no *real, substantial relation* to public objects which government may legally accomplish,—if they are arbitrary and unreasonable, *beyond the necessities of the case*,—the judiciary will disregard mere forms, and interfere for the protection of rights injuriously affected by such illegal action.") (emphasis added); *Mugler v. Kansas*, 123 U.S. 623, 661 (1887) ("If . . . a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has *no real or substantial relation* to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution.") (emphasis added).

564 U.S. 552, 591-92 (2011) (Breyer, J., dissenting) ("[In the *Lochner*] era . . . judges scrutinized legislation for its interference with economic liberty. History shows that the power was much abused and resulted in the constitutionalization of economic theories preferred by individual jurists."); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 589 (1980) (Rehnquist, J., dissenting) ("[In the *Lochner* era,] it was common practice for this Court to strike down economic regulations adopted by a State based on the Court's own notions of the most appropriate means for the State to implement its considered policies.").[4]

It was not until the year following this Court's decision in *Gambone* that the United States Supreme Court finally interred *Lochner's* economic substantive due process doctrine. In *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483 (1955), the High Court observed that "[t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Id.* at 488. The High Court explained that "[a] law need not be in every respect logically consistent with its aims to be constitutional. It is

---

[4] During the "New Deal," the United States Supreme Court shifted toward its modern, deferential approach to substantive due process. The *Lochner* era's end is generally associated with the High Court's decision in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), wherein the Court upheld a minimum wage law in a departure from earlier cases in which it had found such laws to violate due process by interfering with the freedom of contract. In *Parrish*, the Court stated as follows:

> Liberty under the Constitution is . . . necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process. . . . Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.

*Id.* at 391-92 (quoting *Chicago, B. & Q. Ry. Co. v. McGuire*, 219 U.S. 549, 565 (1911)).

enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id.* at 487-88. This is the rational basis test as it is commonly understood, at least at the federal level. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976) ("[T]he burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."); *Richardson v. Belcher*, 404 U.S. 78, 84 (1971) ("If the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the action of Congress is not so arbitrary as to violate the Due Process Clause of the Fifth Amendment."); *Ferguson v. Skrupa*, 372 U.S. 726, 731-32 (1963); *Heffner v. Murphy*, 745 F.3d 56, 79 (3d Cir. 2014) (citing, *inter alia*, *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)) ("Under rational basis review, a statute withstands a substantive due process challenge if the state identifies a legitimate state interest that the legislature could rationally conclude was served by the statute. . . . A governmental interest that is asserted to defend against a substantive due process challenge need only be plausible to pass constitutional muster; we do not second-guess legislative choices or inquire into whether the stated motive actually motivated the legislation.") (internal citations and quotation marks omitted).

Oddly enough, as the federal courts evolved toward a "rational relationship" standard, this Court nonetheless has persisted in employing the language of *Gambone* to superintend legislation, sometimes striking laws and at other times upholding them. *Compare Nixon v. Commonwealth*, 839 A.2d 277, 290 (Pa. 2003) (holding that Act 13 did not have "real and substantial relationship" to Commonwealth's interest in protecting elderly individuals from victimization, and thus, Act 13 violated employees' due process right to pursue particular occupation) *and Pa. State Bd. of Pharmacy v. Pastor*, 272 A.2d 487, 494 (Pa. 1971) (holding that statute making it unlawful for pharmacist to

advertise prices of dangerous or narcotic drugs bore "no substantial relation" to objects sought to be obtained by its enactment) *with Khan*, 842 A.2d at 947 ("As long as there is a basis for finding that the statute is rationally related to a legitimate state interest, the statute must be upheld."); *Laudenberger v. Port Auth. of Allegheny Cnty.*, 436 A.2d 147, 156-57 (Pa. 1981) ("The touchstone of substantive due process . . . is whether the law in question is *rationally related* to a legitimate state goal") (emphasis added) *and Adler v. Montefiore Hosp. Ass'n of W. Pennsylvania*, 311 A.2d 634, 642 (Pa. 1973) ("As the reasonableness of the challenged policy is amply supported by the record, we find no Due Process violation.").

Although our decisions relying upon *Gambone* purport to apply the rational basis test, the plain language of *Gambone* departs significantly from the teachings of the modern federal cases. We confronted this discrepancy in *Nixon*. In the face of the Commonwealth's argument for a more deferential rational basis test, *i.e.*, "the rational basis test used in equal protection challenges and in due process challenges brought under the United States Constitution," *Nixon*, 839 A.2d at 288 n.15, we insisted that "[a]lthough the due process guarantees provided by the Pennsylvania Constitution are substantially coextensive with those provided by the Fourteenth Amendment, a more restrictive rational basis test is applied under [the Pennsylvania] Constitution." *Id.*

But why? *Nixon* based its reasoning on nothing other than *Pastor*, 272 A.2d at 490-91 (observing that "Pennsylvania . . . has scrutinized regulatory legislation perhaps more closely than would the Supreme Court of the United States."), a 1971 opinion which was guided by *Gambone* and other earlier cases. Thus, *Nixon* merely circles back to the same *Lochner* deficiency. It is time to acknowledge that this less deferential test is imprudent. It is undoubtedly true that our judicial role empowers us (and, when called upon, requires us) to assess the constitutionality of laws passed by the

legislature. But we are not authorized to judge the necessity or expediency of those laws. It is equally true of this Court as it is of the federal courts that we do not "sit as a superlegislature to weigh the wisdom of legislation, and we [should] emphatically refuse to go back to the time when courts used the Due Process Clause to strike down state laws . . . because they may be unwise, improvident, or out of harmony with a particular school of thought." *Ferguson*, 372 U.S. at 731-32 (footnotes and internal quotation marks omitted). I am confident that, *Gambone* notwithstanding, most Pennsylvania jurists have long since forsaken *Lochner* and have long understood our duty to defer to the General Assembly when analyzing laws that impact ordinary rights and privileges.[5]

In point of fact, this Court has embraced a more deferential approach to due process in several decisions both before and since *Nixon*. *See Driscoll v. Corbett*, 69 A.3d 197, 215 (Pa. 2013) ("The mandatory retirement provision for judicial officers is subject to deferential, rational-basis review under both equal protection and due process, and it satisfies that standard."); *Commonwealth v. Duda*, 923 A.2d 1138, 1151 (Pa. 2007) ("[I]n evaluating [a Due Process challenge], we employ the rational basis

---

[5]    This view is, of course, not limited to Pennsylvania jurists. Interestingly, Judge Henry J. Friendly of the United States Court of Appeals for the Second Circuit—the son-in-law of *Gambone's* author, Chief Justice Horace Stern—once authored a draft opinion, never published because the case became moot, in which he also endorsed a deferential judicial approach:

> The contest on this, as on other issues where there is determined opposition, must be fought out through the democratic process, not by utilizing the courts as a way of overcoming the opposition[,] . . . clearing the decks, [and] thereby enabl[ing] legislators to evade their proper responsibilities. Judicial assumption of any such role, however popular at the moment with many high-minded people, would ultimately bring the courts into the deserved disfavor to which they came dangerously near in the 1920's and 1930's.

A. Raymond Randolph, *Before Roe v. Wade: Judge Friendly's Draft Abortion Opinion*, 29 Harv. J.L. & Pub. Pol'y 1035, 1042 (2006) (alterations in original).

test, under which a statutory classification will be upheld so long as it bears a reasonable relationship to accomplishing a legitimate state purpose. In undertaking this analysis, courts are free to hypothesize grounds the Legislature might have had for the classification.") (citation omitted); *Commonwealth v. Burnsworth*, 669 A.2d 883, 889 (Pa. 1995) ("To [perform the rational basis analysis], we have set forth a two[-]step approach. First, we must determine whether the challenged statute is designed to further a legitimate state interest or public value. If it is, we must then determine whether the statute is reasonably related to accomplishing the articulated state interest. Essentially, we must address whether the statute has some relationship to the interest which the legislature seeks to promote and whether that relationship is reasonable.") (citations omitted).[6]

---

[6] The cases are legion. *See Plowman*, 635 A.2d at 127 ("As to the second prong of the rational basis test, we need not specifically conclude that the subject statute will be absolutely successful in accomplishing its objective. The legislation must bear a rational relationship to the interest that the legislature seeks to promote. In analyzing any statute under the 'rational basis test,' we must determine whether the legislation has some relationship to the identified state interest and whether that relationship is objectively reasonable. . . . To satisfy this prong, however, it is enough that we identify potential benefits to our citizens as a result of the promulgated legislation."); *Commonwealth v. Mikulan*, 470 A.2d 1339, 1342 (Pa. 1983) ("[I]t is beyond dispute that the General Assembly has a compelling interest in protecting the health and safety of the travelers upon our highways and roads against the ravage caused by drunken drivers, and that the means chosen to serve that interest . . . is rationally and reasonably related to achievement of that legitimate goal.") (emphasis omitted); *Mikulan*, 470 A.2d at 1348 (Zappala, J. concurring) ("[T]he statute in question has a rational relationship to a valid state objective. The requirements of due process have clearly been met to the extent that the legislature has acted in an area properly the subject of its police power, and has not done so arbitrarily."); *Laudenberger*, 436 A.2d at 157 (citing *Rogin v. Bensalem*, 616 F.2d 680 (3d Cir. 1980)) ("The touchstone of substantive due process, as with equal protection, is whether the law in question is rationally related to a legitimate state goal, or whether the state action arbitrarily works to deny an individual of life, liberty, or property.").

Although we are of course the arbiters of constitutionality, we do no violence to that role when we defer prudentially to legislative policymaking. The *Gambone/Nixon* standard validates and encourages judicial overstepping, allowing courts to usurp the legislative role and to strike down laws merely because they are imperfect, unwise, or under-inclusive. Surely, some very large proportion of legislative work could fall within one or more of these categories. But republican democracy is a messy business. It is time to cease adherence to the outdated and overbroad language of *Gambone* in applying the rational basis test in Pennsylvania.

Justice Oliver Wendell Holmes, Jr. dissented in *Lochner*. As usual, Justice Holmes put it better than others could, then or now:

> This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law. It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious, or if you like as tyrannical, as this, and which, equally with this, interfere with the liberty to contract. Sunday laws and usury laws are ancient examples. A more modern one is the prohibition of lotteries. The liberty of the citizen to do as he likes so long as he does not interfere with the liberty of others to do the same, which has been a shibboleth for some well-known writers, is interfered with by school laws, by the Post [O]ffice, by every state or municipal institution which takes his money for purposes thought desirable, whether he likes it or not. The 14th Amendment does not enact Mr. Herbert Spencer's Social Statics. The other day we sustained the Massachusetts vaccination law . . . . United States and state statutes and decisions cutting down the liberty to contract by way of combination are familiar to this court. Two years ago we upheld the prohibition of sales of stock on margins, or for future delivery, in the Constitution of California. The decision sustaining an eight-hour law for miners is still recent. Some of these laws embody convictions or prejudices which judges are likely to share. Some may not. But a Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of laissez faire. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not to

conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States.

General propositions do not decide concrete cases. The decision will depend on a judgment or intuition more subtle than any articulate major premise. But I think that the proposition just stated, if it is accepted, will carry us far toward the end. Every opinion tends to become a law. I think that the word 'liberty,' in the 14th Amendment, is perverted when it is held to prevent the natural outcome of a dominant opinion, unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law.

*Lochner*, 198 U.S. at 75-76 (Holmes, J., dissenting) (citations omitted).[7] More recently, Justice John Paul Stevens recalled his former colleague, Justice Thurgood Marshall, explaining the constitutional standard succinctly: "The Constitution does not prohibit legislatures from enacting stupid laws." *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 209 (2008) (Stevens, J., concurring). They have done so before. They will do so again. They have that right, and they answer to the electorate for its exercise.

The more deferential standard has been recognized by venerated American jurists and wisely embraced at the federal level. I cannot endorse the Majority's adherence to the *Gambone* standard as interpreted by *Nixon.* I agree with the Majority's ultimate conclusion that 75 Pa.C.S. § 1611(e) does not violate due process because it is rationally related to the legitimate state interest of deterring drug-trafficking. But, in my view, the Majority's analytical route to that result countenances undue encroachment upon legislative prerogative. While I recognize that *Gambone* and *Nixon* remain on the books, this Court should abandon those precedents and embrace the federal rule that Justice Holmes foreshadowed more than a century ago.

---

[7] *See also* Letter from Oliver Wendell Holmes, Jr., to Harold J. Laski, (Mar. 4, 1920), *in Holmes-Laski Letters*, at 249 (Mark DeWolfe Howe ed., vol. 1) (1953) ("[I]f my fellow citizens want to go to Hell I will help them. It's my job.").